Louis J. SPACCO, Jr. et al., Plaintiffs,

v.

**BRIDGEWATER SCHOOL
DEPARTMENT, et al.,
Defendants.**

Civ. A. No. 89-883-WF.

United States District Court,
D. Massachusetts.

Aug. 22, 1989.

Frances S. Cohen, Linda G. Baver, Hill &
Barrow, John Reinstein, Mass. Civil Liber-
ties Union, Boston, Mass., for plaintiffs.

Robert G. Clark, III, Brockton, Mass., for
defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. *Summary*

Plaintiffs are two elementary school stu-
dents in the Town of Bridgewater, Massa-
chusetts and their parents. The students
were assigned in 1988-89 to attend public
school in space at the St. Thomas Aquinas
Parish Center that the Town leased from
the Roman Catholic Church. They have
been assigned to the same facility for the
next school year, which begins in early
September, 1989.

The lease in this case requires that the
Town not use the rented facilities in any
manner which is inconsistent with the
teachings of the Roman Catholic Church;
requires the Town to rely upon and defer
to the teaching authority of the Roman
Catholic Archbishop of Boston in this re-
gard; provides that if any provision of the
lease is continuously violated, the Town
may be evicted from the Parish Center on
fourteen days notice; and also provides
that if the requirement that the Town's use
of the facility conform to the teachings of
the Catholic Church is declared invalid, the
lease shall automatically terminate immedi-
ately. In addition, the manner in which the
leased facility is used involves regularly
exposing the children to religious symbols
in the course of their public school enroll-
ment and to a parish priest who periodical-

ly greets the students as they enter the Parish Center.

After protesting the prospective signing of the lease, raising issues regarding particular aspects of the use of the Parish Center, and unsuccessfully seeking reassignment of their children, the plaintiffs brought this action alleging violations of the Establishment and Free Exercise Clauses of the First Amendment of the United States Constitution. The defendants are the Town of Bridgewater, its School Department, its School Committee, and the members of that Committee.

Plaintiffs are seeking a declaratory judgment invalidating the lease. They also request preliminary and permanent injunctive relief requiring reassignment of the plaintiff children and enjoining the continued lease of the St. Thomas Aquinas Parish Center, at least on the current terms of the lease. As a practical matter, however, plaintiffs' pending motion for preliminary injunction is aimed at achieving only a prompt reassignment of the two plaintiff students. Plaintiffs have been willing to have the question of the continued operation of the public school at the Parish Center await a decision on the merits and the results of discovery concerning the implications of ordering the Parish Center closed. Defendants have opposed the motion for preliminary injunction.

For the reasons explained in this Memorandum, plaintiffs have proven that they are entitled to a preliminary injunction requiring the reassignment of the two students who are plaintiffs in this case. They have also made a strong showing that they will ultimately prove that the present lease of the St. Thomas Aquinas Parish Center violates the Constitution.

More specifically, plaintiffs have at this point shown that they are likely ultimately to prevail on their claim that the Establishment Clause is violated for two reasons. First, it appears the lease and use of the Parish Center has a primary effect of endorsing the Roman Catholic religion because, viewed in context, the Town's conduct concerning the lease conveys the impermissible message that Roman Catholics are preferred and other individuals are disfavored. Second, it also at this point appears that the lease involves an impermissible delegation or sharing of Bridgewater's responsibility for the public school curriculum with the Roman Catholic Church, and thus excessively entangles Church and State.

Since the plaintiffs have shown that they are entitled to preliminary injunctive relief based on their Establishment Clause claims, it has not been necessary (or in the time available possible) for the court to analyze their Free Exercise Clause claims.

As explained below, defendants must by August 28, 1989 reassign the students who have brought this case. In addition, it is now appropriate to determine whether this case can be decided on plaintiffs' pending motion for summary judgment.

II. *Findings of Fact and Conclusions of Law*

The facts found in this Memorandum are either undisputed or proven by a preponderance of the evidence.

1. Background

*The Parties*

Louis Spacco, Jr. and Elaine Spacco are parents of a nine year-old son, Louis Spacco III, who is enrolled in the fourth grade in the Bridgewater Public Schools. In the summer of 1988, the Spaccos were notified that the School Department had assigned Louis to the McElwain Elementary School; that his third grade class would meet in one of the auxiliary classrooms in the St. Thomas Aquinas Parish Center; and that Louis would continue to be assigned to the Parish Center through the 1990–91 school year, when he would be in the fifth grade.

Elaine Spacco was raised a Protestant, and Louis Spacco, Jr. considers himself an agnostic. The Spacco family does not attend any church. Mr. and Mrs. Spacco have chosen not to bring the children up in any faith and prefer that the Catholic Church not be involved in their son's public education. The Spaccos want their children to choose a religious affiliation for themselves.

Vishnu and Rajni Arya and their children are permanent residents of the United States and citizens of India. The Aryas have lived in the United States since 1982. Their eight year-old daughter, Nupur, is enrolled in the Bridgewater Public Schools and was assigned to a third grade class at McElwain with Louis Spacco. In the summer of 1988, the Aryas were also notified by the School Department that Nupur would be assigned to the St. Thomas Aquinas Parish Center beginning with the 1988–89 school year, and continuing through the 1990–91 school year, when Nupur would be in the fifth grade.

The Aryas practice Hinduism, observing the Hindu Calendar of Festivals. They participate in prayers with their daughter Nupur at home and at a Hindu temple in Ashland, Massachusetts. Their fourteen year-old son attends high school in India.

The Aryas are concerned that Nupur will be exposed to Catholic influences while attending school at the Parish Center. They plan to send Nupur back to India eventually to continue her education there, as her brother has done, and fear that daily exposure to Catholic religious influences may make this transition more difficult for her. The Aryas believed that Church and State were separate in the United States, and hoped that Nupur would receive a general, secular public school education. The Aryas find a conflict between the religious practices Nupur is taught at home and the religious atmosphere at the Parish Center.

### The Lease

This action arises out of plaintiffs' objections to Bridgewater's lease of public school space from the Roman Catholic Church. In October, 1988, the Bridgewater School Department entered into a four-year lease, from July 1, 1988 to June 30, 1992, for the St. Thomas Aquinas Parish Center, a facility used by the Church primarily for late afternoon catechism classes. Bridgewater pays $62,000 per year to lease the facility.

The lease provides in Article IV, Section 6 that:

> Tenant's use of the Premises shall at all times be consistent with the teachings of the Roman Catholic Church enunciated by the Holy Father and Bishops in communion with him.

The power to determine the scope of this clause is specifically vested in the Church by the lease, which also states:

> In this regard the parties hereto shall rely upon and defer to the teaching authority of the Roman Catholic Archbishop of Boston.

See Article IV, Section 6.

The parties have agreed that, in the event that Article IV, Section 6 of the lease is found invalid or unenforceable, or is severed from the lease, the lease will automatically terminate without notice. See Article XIX, Section 2. The Church may, after giving notice of default, terminate the lease on fourteen days notice if it perceives that Article IV, Section 6 has been violated and such violation has not been promptly cured. See Article XIV. In addition, either party may cancel the lease without cause by giving sixty days notice. See Article XII.

The lease also restricts the type of sign that may be posted on the premises, and requires the School Department to obtain the prior written approval of the Archbishop before installing signs at the Parish Center. See Article VIII, Section 1. The Church may use the leased premises for whatever purposes it deems appropriate when school is not in session or "where joint use is possible." Article IV, Section 3.

### The St. Thomas Aquinas Parish Center

The St. Thomas Aquinas Parish Center is situated in a complex of buildings owned and operated by the Roman Catholic Church. A large cross is prominent on the facade, and letters mounted on the front wall of the Parish Center identify the building as the "St. Thomas Aquinas Parish Center." Bridgewater has posted no sign to announce that the premises are also used as a public elementary school.

The Church maintains offices in the Parish Center during public school hours. One office has at times had religious notices

posted on the door. The Church offices are not physically separated from the rooms used for public school classes, and in some cases are right next door to or across the hall from the elementary school classrooms. The Church uses the entire St. Thomas Aquinas Parish Center for its afternoon catechism classes and other church activities.

The eight classrooms rented by the School Department each contain religious emblems that are draped with a cloth covering by representatives of the Church each morning before the public school students arrive. Church representatives uncover the religious emblems in the classrooms each afternoon after the students leave. In addition, bulletin boards containing religious notices have been covered up with cardboard.

Public school students at the Parish Center have asked what is under the cloth covering in their classrooms. On at least one occasion, a teacher has removed the covering to show the students the religious emblems.

A small room in the Parish Center that is used by the principal and public school teachers as a lunchroom and for meetings with parents and students contains religious emblems that have not been covered. Louis Spacco, III and other students have met with the principal in this room, and students have been sent there for discipline. While in this room, the students have been exposed to religious pictures, crosses, and other religious emblems.

Religious symbols have also remained in areas to which the public school children have regular access. During the 1988–89 school year, these included a placard containing an Irish prayer inviting God's blessing which was mounted on a classroom door. Religious announcements, such as flyers describing the religious services to be held in connection with Easter, have from time to time been posted on the walls of the St. Thomas Aquinas Parish Center. In addition, each day on their way to the playground, the children go through the Church cemetery, which is replete with crosses, religious statutes, and religious sayings (e.g. "Mother Mary pray for me"), as well as American flags. In the playground, the children take their recreation under five large crosses on the top of the church that is part of the compound that includes their school.

When Mr. Spacco complained at a School Committee meeting about the presence of religious symbols in the school facilities leased from the Archbishop at the Parish Center, he was told by a member of the School Committee, "Just tell your son not to look up."

On some school mornings, a parish priest wearing clerical garb has stood outside the main door of the Parish Center and greeted the school children, many of whom are apparently known to him from catechism class. On occasion during the school day, a priest, in his robes, walks through the hallways of the Parish Center. Mr. Spacco objected at a School Committee meeting to the priest's presence. The School Committee's response was to tell Mr. Spacco to raise his objections directly with the priest.

Because of these circumstances, the Spaccos and Aryas asked Bridgewater school officials to transfer their children from the public school classes at the Parish Center to classes in another public school building. The Spaccos and the Aryas first raised objections to the lease and the assignment of their children to the Parish Center in the summer of 1988, when the lease was being negotiated and before the lease was signed. Their requests were denied by the School Committee and by other school officials. School officials told Mr. Spacco that if he wanted his child to attend classes in another building, the family should move to a neighborhood served by a different public school.

Plaintiffs filed this case in April, 1989. On June 14, 1989, Mr. Spacco appeared before the School Committee. In response to what was the first offer to transfer his son from the St. Thomas Aquinas Parish Center, Mr. Spacco said he would drop his suit if Louis were transferred back to the Burnell School, which he had previously attended. According to the official minutes of that meeting, Mr. Spacco also said

that "he did not see the need to rent the Parish Center but he thought that certain people's rights should be looked at on a one to one basis. He was hesitant to do anything that would hurt the facility being used." However, while the School Committee was willing to transfer Louis Spacco, III, it was unwilling to assign him to Burnell, a laboratory school associated with Bridgewater State College. Thus, according to the official minutes, "the end result was that [Mr. Spacco] was told that if you don't like it, sue us."

On July 14, 1989, plaintiffs filed the pending motion for preliminary injunction. In the course of several conferences, the court was informed that renewed settlement discussions had been unsuccessful, the relevant legal issues were sharpened, and discovery pertaining to the motion for preliminary injunction was identified. The briefs and evidence relating to the motion for preliminary injunction were supplemented by August 15, 1989. The court visited the St. Thomas Aquinas Parish Center on August 15, 1989. A hearing was held on August 16, 1989.

Additional relevant findings of fact are included in the following discussion.

### 2. Standing

▮ As plaintiffs are two students assigned to attend public school at the McElwain School Annex located at the St. Thomas Aquinas Parish Center, and their parents, they have standing to maintain their Establishment Clause claims. They have made the necessary showing that they have suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants and that such injury is likely to be redressed by a favorable decision by this court. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). As the Supreme Court said in *Abington School District v. Schempp*, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963):

The requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed. The parties here are school children and their parents, who are directly affected by the laws and practices [concerning school prayer] against which their complaints are directed. These interests surely suffice to give the parties standing to complain.

*See also American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1104 (11th Cir.1983).

In addition, the plaintiff parents have standing as taxpayers to maintain their Establishment Clause claims. They pay taxes to the Commonwealth of Massachusetts, which are distributed in part to Bridgewater as school aid. Moreover, although the plaintiff parents do not own real property in Bridgewater, they pay rent which is applied in part by their landlords to pay local real estate taxes. Bridgewater real estate tax revenues are, like the state aid, used to fund the public schools, including the rental of the St. Thomas Aquinas Parish Center. Thus, the plaintiff parents have standing as taxpayers to maintain their Establishment Clause claims. *See Grand Rapids School District v. Ball*, 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3220 n. 5, 87 L.Ed.2d 267 (1985); *Everson v. Board of Education*, 330 U.S. 1, 3, 67 S.Ct. 504, 505, 91 L.Ed. 711 (1947).

### 3. The Standards for Preliminary Injunction

▮ As is well recognized, a preliminary injunction shall issue if plaintiffs demonstrate (1) a likelihood of success on the merits of their claim; (2) they do not have an adequate remedy at law and will suffer irreparable harm without the injunction; (3) this harm is greater than the injury the defendant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir.1988); *Collazo Rivera v. Torres Gaztambide*, 812 F.2d 258, 259 (1st Cir.1987); *Planned Par-*

*enthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). Plaintiffs in this case have satisfied each of these criteria.

## A. The Likelihood of Success on the Merits

The Supreme Court has articulated a three part test series for determining whether a statute violates the Establishment Clause. "First, the [conduct] must have a secular ... purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [conduct] must not foster an 'excessive government entanglement with religion.'" *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted). If government conduct violates any one of the Establishment Clause prongs, that conduct is unconstitutional. *See, e.g., Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

The *Lemon* test provides guidelines, rather than a precise formula, for identifying instances in which the objectives of the Establishment Clause have been impaired. *Meek v. Pittenger,* 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975). The Supreme Court has, however, "particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children." *Grand Rapids,* 473 U.S. at 383, 105 S.Ct. at 3222.

In this case, Bridgewater's conduct appears at this point to have a secular purpose and, therefore, to satisfy the first prong of the *Lemon* test. The plaintiffs have, however, made a strong showing that Bridgewater's conduct fails the second and third prongs of the *Lemon* test. Thus, they have demonstrated a likelihood that they will prevail on the merits of their claim that Bridgewater's lease and use of the St. Thomas Aquinas Parish Center violates the Establishment Clause.

### Secular Purpose

To determine whether Bridgewater's lease of the St. Thomas Aquinas Parish Center has a secular purpose, the Town's actual intentions must be ascertained. *Friedman v. Board of County Commissioners,* 781 F.2d 777, 781 (10th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). In this case, plaintiffs do not seem to argue that the lease of the Parish Center lacks a secular purpose. In any event, the evidence does not indicate that plaintiffs are likely to prove that the lease and use of Church property is improperly motivated. To the contrary, the evidence at this point suggests that in 1987 Bridgewater encountered a genuine shortage of elementary school space, did a study to explore options to alleviate that shortage, and found renting space at the St. Thomas Aquinas Parish Center to be the most cost-efficient option available. Thus, it now appears likely that it will ultimately be found that the leasing of space at the St. Thomas Aquinas Parish Center had a secular purpose.

### Primary Effect

The fact that government conduct has a secular purpose, however, does not immunize it from scrutiny to determine whether it nevertheless has a constitutionally impermissible effect. *Committee for Public Education & Nyguist,* 413 U.S. 756, 783–84 n. 39, 93 S.Ct. 2955, 2970–71 n. 39, 37 L.Ed.2d 948 (1973). As indicated earlier, government conduct is unconstitutional if its principal or primary effect either advances or inhibits religion. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111.

Government action may, for Establishment Clause purposes, have multiple "primary effects." *Allen v. Morton,* 495 F.2d 65, 70 (D.C.Cir.1973). Government conduct which confers merely "incidental" benefits on a religious organization does not have the primary effect of advancing religion. *Widmar v. Vincent,* 454 U.S. 263, 273, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981); *United Christian Scientists v. First Church of Christ,* 829 F.2d 1152, 1169 (D.C.Cir.1987). *See also* L. Tribe, *American Constitutional Law* § 14–10, at 1215 (2d Ed.1988) ("The constitutional requirement of 'primary secular effect' has become a misnomer; the

Court has transformed it into a *require-ment that any non-secular effect be re-mote, indirect and incidental.*") (emphasis in original). In *Widmar*, the Supreme Court identified two factors that are especially relevant in determining whether benefits are merely "incidental." The Supreme Court first looked to see whether the benefit "confer[red] any imprimatur of state approval on religious sects or practices." *Widmar*, 454 U.S. at 274, 102 S.Ct. at 276. It then considered whether the benefit conferred was "available to a broad class of non-religious as well as religious beneficiaries." *Id.* Applying these criteria to the instant case indicates that the lease of St. Thomas Aquinas Parish Center fails both aspects of the *Widmar* tests and has a primary effect of advancing the Roman Catholic religion.

This conclusion seems particularly compelling in light of the Supreme Court's recent clarification of the meaning of, and analytical framework for, the "primary effects" prong of the *Lemon* test. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, —— U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In *County of Allegheny*, the Supreme Court re-affirmed that government conduct which has the effect of endorsing religion is invalid. *Id.* 109 S.Ct. at 3102. "The prohibition against governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religion is preferred.'" *Id.* at 3101 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1984)). "'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'" *Id.* 109 S.Ct. at 3107 (quoting *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982)); *Edwards v. Aquillard*, 482 U.S. 578, 593, 107 S.Ct. 2573, 2582, 96 L.Ed.2d 510 (1987). It is also, however, impermissible for the government to favor religious belief over disbelief. *County of Allegheny*, 109 S.Ct. at 3101; *Texas Monthly, Inc. v. Bullock*, —— U.S. ——, 109 S.Ct. 890, 906, 103 L.Ed.2d 1 (1989) (While, J., concur-

ring in judgment); *Abington School District*, 374 U.S. at 205, 83 S.Ct. at 1562 (Goldberg, J., concurring).

As the Supreme Court has explained, the endorsement of religion is invalid because "'it sends a message to nonadherents that they are outsiders, not full members of political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" *County of Allegheny*, 109 S.Ct. at 3102 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). Therefore, whether government conduct is permissible depends in meaningful measure on the message that conduct communicates. *Id.* The message conveyed by such conduct depends significantly upon its context. *Id.* Thus, each case must be determined upon its unique facts.

Therefore, in this case it is necessary for the court to ascertain whether the lease and use of the Parish Center "'is sufficiently likely to be perceived by [Roman Catholics] as an endorsement, and by nonadherents as a disapproval of their individual religious choices.'" *Id.* 109 S.Ct. at 3103 (quoting *Grand Rapids*, 473 U.S. at 390, 105 S.Ct. at 3226). Moreover, as the Supreme Court said in analyzing the display of a Christmas Tree and Menorah in *County of Allegheny*:

> While adjudication of the display's effect must take into account the perspective of one who is neither Christian nor Jewish, as well as those who adhere to either of these religions [*Grand Rapids*, 473 U.S. at 390, 105 S.Ct. at 3226], the constitutionality of its effect must also be judged according to the standard of a *"reasonable observer."* *See Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481, 493 [106 S.Ct. 748, 754, 88 L.Ed.2d 846] (1986) (O'Connor, J., concurring in part and concurring in judgment); *see also* Tribe at 1296 (*challenged government practices should be judged "from the perspective of a 'reasonable nonadherent'"*).

*Id.* 109 S.Ct. at 3115 (emphasis added).

As Professor Tribe explained in the section of his treatise cited by the Supreme Court:

It seems that, in deciding whether a government practice would impermissibly convey a message of endorsement, one should adopt the perspective of a non-adherent; action that reasonably offends non-adherents may seem so natural and proper to adherents as to blur into the background noise of society.

L. Tribe, *supra*, § 14–15, at 1293. *See also Developments–Religion and the State*, 100 Harv.L.Rev. 1606, 1647–50 (1987) ("If the Establishment Clause is to prohibit government from sending the message to religious minorities or nonadherents that the state favors certain beliefs and that as nonadherents they are not fully members of the political community, its application must turn on the message received by the minority or non-adherent.").

It appears to this court that it may be most appropriate to consider the message sent by government conduct to adherents from the perspective of the reasonable adherent and the message sent to nonadherents from the perspective of the reasonable nonadherent, and deem such conduct unconstitutional if it sends an impermissible message to a reasonable person in either group. This formulation of the relevant test would acknowledge that reasonable adherents and reasonable nonadherents may reasonably differ in the message they receive from the same government conduct. There may, however, not really be an ideal, homogenized "reasonable observer." In view of the Supreme Court's clarification in *County of Allegheny* that government conduct is impermissible if it endorses religion in significant part because it sends a message to nonadherents that they are outsiders rather than full members of the political community, it would seem most appropriate to invalidate conduct that makes such a statement to reasonable nonadherents even if reasonable adherents would not view the same conduct as giving them favored, insider status.

In any event, this issue is more interesting than important for the purpose of deciding the pending motion for preliminary injunction in the instant case. Upon consideration, to the best of its ability, of the evidence from the perspective of the 'reasonable observer' as well as from the perspectives of the reasonable Roman Catholic and reasonable nonadherent, the court concludes that plaintiffs have made a strong showing that they are likely to prove that the conduct in question in this case conveys impermissible messages to all relevant recipients.

This conclusion is influenced in part by recognition that many of those affected by Bridgewater's conduct are impressionable, young children. As the Supreme Court has explained:

[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval of their individual religious choices. *The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years.* (Citations omitted). *The symbolism of a union between church and state is most likely to influence children of tender years whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice.*

*Grand Rapids*, 473 U.S. at 390, 105 S.Ct. at 3226 (emphasis added). *See also Edwards v. Aguillard*, 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.... Students in such institutions are impressionable and their attendance is involuntary.").

The evidence that strongly shows that plaintiffs are likely to prevail on the merits of their claim that Bridgewater's lease and use of the St. Thomas Aquinas Parish Center violates the Establishment Clause includes the following. As indicated earlier, Article IV, Section 6 of the lease provides that the public school's use of the space it rents must be consistent with the teachings

of the Roman Catholic Church and that Bridgewater shall in this regard defer to the teaching authority of the Roman Catholic Archbishop of Boston. The importance of this provision is emphasized by the severability clause of the lease, which provides that if any other section of the lease is deemed invalid, the remainder of lease will be unaffected; if, however, Article IV, Section 6 is deemed invalid, the lease will automatically terminate immediately.

As discussed in the analysis of the entanglement prong of the *Lemon* test *infra*, the plaintiffs have shown that they are likely to prevail on their claim that the lease in this case is the functional equivalent of sharing with the Roman Catholic Church the power to determine aspects of the public school curriculum. A corollary of this is the conclusion that the lease reasonably appears to share this power with the Church. As the Supreme Court has found in language applicable to the instant case, "the mere appearance of a joint exercise of authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred," and, therefore, has the impermissible primary effect of advancing religion. *Larkin v. Grendel's Den*, 459 U.S. 116, 126–27, 103 S.Ct. 505, 511–12, 74 L.Ed.2d 297 (1982); *Grand Rapids*, 473 U.S. at 389–90, 105 S.Ct. at 3225–26. *See also Friedman*, 781 F.2d at 781.

This conclusion is reinforced by the actual operation of the St. Thomas Aquinas Parish Center as a public school. The court's visit to the facility resulted in certain vivid impressions, which include the following.

The Church has made an earnest, good faith effort to eliminate religious symbols from the classrooms while they are being used by the public schools. The small crosses in each room are covered by cloths, and bulletin boards containing religious messages are also covered. To a certain extent, those efforts have been successful. Simply sitting in a classroom, a reasonable observer, including a reasonable child, would not receive any constitutionally impermissible message from his or her surroundings. When, however, the focus is widened to put the classroom experience in context, the evidence indicates that the use of the St. Thomas Aquinas Parish Center is constitutionally invalid.

As described earlier, in order to enter the building, the children and other individuals pass beneath a large cross beside the name St. Thomas Aquinas Parish Center. On a number of occasions, a priest has greeted the children at the door. Some of the children are apparently known to the priest from attending afternoon catechism classes in that building or from other church activities. Occasionally, flyers describing religious events have been posted by the entry. An Irish prayer inviting God's blessing was posted on a door throughout the 1988–89 school year. Religious notices were also regularly posted on the door of a room within the leased space that is used by the Church during public school hours.

Each day, weather permitting, the children at lunch time go through the church cemetery to an area adjacent to the church parking lot for recess. The cemetery is, quite naturally, replete with crosses, religious statues and religious sayings (such as "Mother Mary pray for me"), as well as American flags. In the playground, the children take their recreation under five large crosses on the top of the church that is part of the compound that includes their school.

In these circumstances, the evidence indicates that plaintiffs are likely to prove that the use of the St. Thomas Aquinas Parish Center conveys a number of related, impermissible messages. At least for present purposes, it has been shown that the manner in which the facility is used communicates to a reasonable observer, particularly a reasonable elementary school child, that: the public school and the Roman Catholic Church are closely linked; the Roman Catholic Church has a special status in our society; Roman Catholic people are preferred; Roman Catholic children who attend catechism classes at the St. Thomas Aquinas Parish Center are attending public school in a place that is especially theirs;

members of other faiths are outsiders or guests; and the government favors and encourages religious belief rather than disbelief.

Moreover, these messages are not merely symbolic. Rather, as the Aryas particularly fear, these messages may influence the beliefs and behavior of children who are not being raised as Catholics. As the Supreme Court has recognized, "When the ... prestige ... of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Abington School District*, 374 U.S. at 221, 83 S.Ct. at 1570–71. This is especially true when it is remembered that, as Justice Felix Frankfurter wrote, "the law of imitation operates and non-conformity is not an outstanding characteristic of children." *McCollum v. Board of Education*, 333 U.S. 203, 227, 68 S.Ct. 461, 473, 92 L.Ed. 649 (1947) (Frankfurter, J., concurring).

The court believes that the foregoing conclusions are consistent with the views of even the dissenters in *County of Allegheny*. Writing for the dissent, Justice Kennedy stated that:

> Symbolic recognition or accommodation of religious faith may violate the [Establishment] Clause in an extreme case. I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall ... because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to prosletyze. *Cf. Friedman*, 781 F.2d 777 (CA 10 1985) (en banc) (Latin cross on official county seal); *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce*, 698 F.2d 1098 (CA 11 1983) (cross erected in public park);

*Lowe v. Eugene*, 254 Or. 518, 463 P.2d 360 (1969) (same).

109 S.Ct. at 3137.

In the *Friedman* case on which Justice Kennedy relied, the Court of Appeals for the Tenth Circuit found that the use of the cross on a county's seal violated the "primary effects" prong of the *Lemon* test and was, therefore, unconstitutional even if that use was motivated by a secular purpose. 781 F.2d 780–82. In *Friedman*, as in the instant case, the court found that the religious significance of the cross was undisputed and its daily use in connection with the performance of public functions conveyed a series of impermissible messages. *Id.* at 782. *See also American Civil Liberties v. City of St. Charles*, 794 F.2d 265, 271 (7th Cir.) ("When prominently displayed on a public building that is clearly marked and known to be such, the cross dramatically conveys a message of governmental support for Christianity, whatever the intentions of those responsible for the display may be. Such a display is not only religious, it is sectarian."), *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Jewish War Veterans of United States v. United States*, 695 F.Supp. 3, 12–14 (D.D.C.1988); *Libin v. Town of Greenwich*, 625 F.Supp. 393, 399 (D.Conn. 1985).

In the instant case, the public school is a more important building than city hall for the children who attend class at the St. Thomas Aquinas Parish Center. For them, the crosses at the Parish Center, reinforced by the other religious aspects of the facility, are at least the functional equivalent of a cross erected permanently on city hall. The erection of the crosses by the church and its members on their building and in their cemetery had valid private purposes. Those crosses, however, have come to constitute a pervasive part of a facility being used as a public school. Plaintiffs are likely to prevail on the claim that their effect in the school context is constitutionally invalid.[1]

---

1. Contrary to defendants' contention, the rental of religious property for use by public schools has not uniformly withstood constitutional challenge. *See Americans United for Separation of Church and State v. Porter*, 485 F.Supp. 432 (W.D.Mich.1980) (leasing portion of a parochial school violated Establishment Clause because it had primary effect of advancing religion and fostered excessive entanglement); *Knowlton v. Baumhover*, 182 Iowa 691, 166 N.W. 202 (1918).

*Entanglement*

The third prong of the *Lemon* test prohibits government conduct that fosters excessive government entanglement with religion. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111. This standard is employed to achieve an important purpose of the Establishment Clause—preventing, as far as possible, the intrusion of the Church or State into the precincts of the other. *Larkin,* 459 U.S. at 126, 103 S.Ct. at 511–12. This separation of Church and State was regarded as important by the Framers of the First Amendment because they "feared not only a denial of religious freedom, but also the danger of political oppression through a union of civil and ecclesiastical control." *Id.* at n. 10. *See also New Life Baptist Church v. East Longmeadow,* 666 F.Supp. 293, 311 (D.Mass.1987).

As the Supreme Court found in *Larkin,* it is impermissible for the government to delegate or share its discretionary functions with religious institutions. 459 U.S. at 127, 103 S.Ct. at 512. Thus, in *Larkin,* the Supreme Court invalidated a statute that delegated to religious institutions a veto power over government licensing authority. *Id.* at 125, 103 S.Ct. at 511. Both the majority, 109 S.Ct. at 3099, and the dissent, *id.* at 3136, in *County of Allegheny* acknowledged the continuing validity of the decision in *Larkin,* which in effect holds that any vesting of government authority in a religious institution constitutes "excessive" entanglement. *See* L. Tribe *supra* § 14–11, at 1229. *See also United Christian Scientists v. Christian Science Board of Directors, First Church of Christ, Scientist,* 829 F.2d 1152, 1170 (D.C. Cir.1987) (invalidating a private copyright law giving a church an extended copyright on all editions of a religious text).

"There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson v. Arkansas,* 393 U.S. 97, 106, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968). *See also Edwards,* 482 U.S. 578, 107 S.Ct. 2573 (1987). Thus, pursuant to *Larkin,* the government may not share with or delegate to a religious institution the power to veto aspects of a public school curriculum.

Bridgewater, however, claims that it has not empowered the Roman Catholic Church to veto any aspect of its curriculum and, therefore, that this case is distinguishable from *Larkin.* However, the court concludes that the plaintiffs have shown, at least for present purposes, that the lease of the St. Thomas Aquinas Parish Center, viewed in the context of Bridgewater's conduct in connection with it, is the functional equivalent of the authority deemed unconstitutional in *Larkin.*

As indicated earlier, in Article IV, Section 6 of the lease Bridgewater agreed that

---

In addition, the cases defendants cite in which leases of religious property have been upheld are not persuasive precedent for the instant case. *See Thomas v. Schmidt,* 397 F.Supp. 203 (D.R.I.1975); *State ex. rel. School District of Hartington v. Nebraska State Board of Education,* 188 Neb. 1, 195 N.W.2d 161, *cert. denied,* 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed.2d 182 (1972); *Brown v. Heller,* 51 Misc.2d 660, 273 N.Y.S.2d 713 (1966). *See also Citizens to Advance Public Education v. Porter,* 65 Mich.App. 168, 237 N.W.2d 232, 237 (1975). Each of these cases was decided before the Supreme Court's decisions in *Larkin* (1982) and *County of Allegheny* (1989), which considerably clarified the principles to be applied in the present case. None of these cases involved situations in which the religious institution involved had the power to influence the public school curriculum. *See, e.g., Citizens to Advance Public Education,* 237 N.W.2d at 237 ("the content of the activity on the premises leased is controlled solely by the public school district. The lessor has no authority whatsoever concerning the activity at these extension schools."); *Brown v. Heller,* 51 Misc.2d 660, 273 N.Y.S.2d at 715 (the church and synagogue that own the leased premises "will exercise no control over the operation of the public school.").

To the extent that defendants rely on the suggestion in *Thomas,* 397 F.Supp. at 212, that contacts with crosses and religious statues that are part of a public school is permissible because these contacts seem little more likely to subject public school children to undue religious influences than the location of a public school right next to a parochial school, this court respectfully disagrees. As *Larkin* and *County of Allegheny,* among other cases, reflect, it is not the simple exposure to religious symbols that is constitutionally impermissible; rather it is the message conveyed, particularly to impressionable youngsters, by the linkage of such symbols to their public school.

its use of the St. Thomas Aquinas Parish Center would "at all times be consistent with the teachings of the Roman Catholic Church enunciated by the Holy Father and the Bishops in communion with him. In this regard the [Town agreed] to rely upon and defer to the teaching authority of the Roman Catholic Archbishop of Boston." The Church may terminate the lease on fourteen days notice if this provision is, in its view, violated and any violation is not promptly corrected. *See* Article XV. In addition, "the lease will automatically, terminate without notice, such termination to become effective immediately," if Article IV, Section 6 is found to be invalid or unenforceable. *See* Article XIX, Section 2.

Under Article IV, Section 6, the Church could terminate the lease if, in its view, anything being continuously taught to children attending school at the Parish Center conflicted with Roman Catholic doctrine. This provision gives the Church the power to influence the elementary school curriculum. There is now no evidence that the Church has sought to exercise this power. Nor is there now any evidence that Bridgewater has actually made any decisions concerning its curriculum to avoid conflict with the teachings of the Roman Catholic Church.

Nevertheless, the record at this point shows that there are aspects of the public school curriculum that raise issues that the parties acknowledge are of concern to the Roman Catholic Church; the Town has a powerful motive to avoid issues which might threaten its continued use of the St. Thomas Aquinas Parish Center; and Town officials have displayed a desire to avoid dealing with the Church on sensitive issues raised by the lease and a tendency to defer to the Church's judgment on matters the Town has a duty to determine independently.

More specifically, there are lessons in the Bridgewater elementary school curriculum that involve matters which are addressed by Roman Catholic doctrine. For example, the third grade curriculum includes a section on the most powerful forces in the world and provides a master list of subjects that might be discussed which includes "God" and "having a baby." Similarly, the fifth grade curriculum contemplates students being asked "What conflicts have developed in the United States since World War II that were not considered major issues earlier?" There is a significant possibility that this question could evoke discussion of abortion, among other issues, by increasingly precocious ten and eleven year old students.

Although the foregoing matters are generally considered appropriate parts of the Bridgewater elementary school curriculum, the Town has a strong incentive to avoid discussion of them at the Parish Center, or to tailor its teaching there to the doctrines of the Roman Catholic Church. The Town leases space at the Parish Center because of overcrowding in its public elementary schools and because in 1987 it perceived no cost-efficient alternative to the lease of the Church property. It is evident, from this litigation among other things, that Bridgewater does not wish to have to re-assign the more than 150 students enrolled at the Parish Center to its regular facilities. It might be particularly unhappy to have to do so on short notice, during the school year. Thus, the Town has a powerful motive to avoid teaching anything at the St. Thomas Aquinas Parish Center which might threaten its continued use of the premises.

This motive operates to reinforce what appears to be the reticence of Town officials to exercise independently their authority, and discharge properly their duties, concerning sensitive issues which have actually arisen from the use of the St. Thomas Aquinas Parish Center as a public school. For example, William McArthur, a member of the School Committee, testified that in 1988 he asked the Superintendent of Schools whether the cross on the facade of the facility should be covered. He was told by the Superintendent that covering the cross "was not necessary in the eyes of the Dioceses in order to make the contract appropriate." Thus, it appears that the Town did not independently consider whether the cross should have been cover-

ed, but delegated, and deferred to, the judgment of the Church on this issue.

Indeed, this deference to the Church continued after Mr. Spacco complained to the School Committee about the cross over the entrance. Rather than consider this question carefully, a member of the School Committee told Mr. Spacco to instruct his child not to look up as he entered the facility.

It appears that Mr. Spacco did not receive an aberrant response to his inquiry about the cross. Rather, when parents expressed concern about their children attending public school at the St. Thomas Aquinas Parish Center, they were told that if they did not like it, they could send their children to private school or educate them at home. Moreover, when Mr. Spacco complained to the School Committee about the priest's periodic presence to greet the school children, he was told to raise his objections directly with the priest. All of these facts indicate an unwillingness by Town officials to confront the Church on sensitive issues and a related inappropriate inclination to urge parents to accommodate the Church.

In view of the foregoing, the court concludes that, at least for present purposes, plaintiffs have shown that the lease of the St. Thomas Aquinas Parish Center constitutes an impermissible delegation or sharing of the Town's power and responsibility concerning what is taught to its elementary school students. The conclusion rests in part on the fact that government must avoid "not only the actual interference but also the potential for and appearance of interference with religion." *Allen v. Morton*, 495 F.2d 65, 75 (D.C.Cir.1973).

The principle that a showing of the potential for the effective exercise of governmental power by a religious institution for religious purposes is sufficient to constitute excessive entanglement was emphasized in *Larkin*. The Supreme Court did not find that the church in *Larkin* had exercised its power to veto the issuance of a liquor license to serve an explicitly religious goal. 459 U.S. at 125, 103 S.Ct. at 511. Moreover, the Supreme Court in *Larkin* assumed that churches would act in good faith and exercise their power in a religiously neutral way. *Id.* Yet the veto power delegated to churches by statute was invalidated because "the potential for conflict inhere[d] in the situation and appellants [had] not suggested any 'effective means of guaranteeing' that the delegated power 'will be used exclusively for secular, neutral, and nonideological purposes.'" *Id.* (citations omitted). Thus, in his lone dissent, Chief Justice Rehnquist indicated that the decision in *Larkin* was based on the Court's "ability to discern a risk of ... abuse." *Id.* at 130, 103 S.Ct. at 511 (Rehnquist, J., dissenting).

At this point, the instant case also presents the potential for the Roman Catholic Church to influence what is taught in a Bridgewater elementary school. Moreover, there is not a feasible means of assuring that the influence over the curriculum which Bridgewater has in effect agreed to share with the Roman Catholic Church is not subtly but significantly exercised. The court perceives that conflict between Bridgewater and the Church may never arise because those responsible for what is taught at the Parish Center will anticipate and avoid teaching matters to which the Church might object. Thus, there appears to be a real risk that the lease will exert a serious "chilling effect" on what is taught at the McElwain Annex.[2]

---

2. The constitutionality of statutes and regulations alleged to have a "chilling effect" on the right to free speech is generally determined by review of such provisions on their face, rather than as actually applied, to determine whether there is a realistic danger that First Amendment rights will be compromised. *See, e.g., Board of Airport Commissioners v. Jews for Jesus*, 482 U.S. 569, 107 S.Ct. 2568, 2571–72, 96 L.Ed.2d 500 (1987). The same standard may be particularly appropriate when, as here, there is a showing of a "chilling effect" which relates to both speech and to the separation of Church and State. *See United Christian Scientists*, 829 F.2d at 1160 n. 29 (reviewing primary effect of statute on its face appropriate in part because "the activity inhibited involves not merely business, but also speech and religious exercise"). It is not, however, necessary to determine whether the issue of excessive entanglement ought to be decided on the face of the lease alone. Consideration of the facts established by the record in

The court assumes for present purposes that government conduct should not be invalidated because there is simply some conceivable, but speculative, potential for impermissible entanglement between Church and State. However, it is not necessary for plaintiffs to prove as a precondition for relief that the precise scenario they fear— which is in this case more than merely speculative—will in fact occur. *Surinach v. Pesquera de Busquets*, 604 F.2d 73, 75 (1st Cir.1979). Rather, as the Court of Appeals for the First Circuit said in *Surinach:*

> [I]n the sensitive area of First Amendment Religious freedoms, the burden is upon the state to show that implementation of a regulatory scheme will *not* ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance. In cases of this nature, a court will often be called upon to act in a predictive posture; it may not step aside and await a course of events which promises to raise serious constitutional problems.

*Id.* at 75–76. At this point, defendant has not borne this burden. To the contrary, the evidence indicates that the lease and Bridgewater's conduct pursuant to it constitute an impermissible delegation to, or sharing with, the Roman Catholic Church of the Town's responsibility to determine what is taught to its elementary school students.[3]

### Political Divisiveness

The conclusion that plaintiffs are likely to prove that Bridgewater's lease and use of the St. Thomas Aquinas Parish Center violates the Establishment Clause is reinforced by the political divisiveness of this issue. "While the prospect of such divisiveness may not alone warrant the invalidation of [conduct] that otherwise sur-

vive[s] ... careful scrutiny, it is certainly a 'warning signal' not to be ignored." *Committee for Public Education v. Nyquist*, 413 U.S. 756, 797–98, 93 S.Ct. 2955, 2977–78, 37 L.Ed.2d 948 (quoting *Lemon*, 403 U.S. at 625, 91 S.Ct. at 2117 (Douglas, J. concurring)).

In this case the subject of the lease has been frequently discussed at School Committee meetings. The propriety of the lease of Church property by the public school ultimately became an issue in the recent Bridgewater School Committee elections. Thus, it appears at this point that Bridgewater has experienced a measure of the "political division along religious lines [which] was one of the principle evils against which the First Amendment was intended to protect." *Lemon*, 403 U.S. at 622, 91 S.Ct. at 2115–116.

This political division along religious lines has been particularly pronounced with regard to plaintiffs personally. Both the Spacco and the Arya families have received threatening telephone calls regarding this lawsuit. The Aryas also received a letter, which said, in part:

> If you don't like things in this country, why don't you go back to India.... If you want to practice Hinduism, move back to India or shut up and be grateful that you are allowed in this country. Do not disrupt our quiet little town for your selfish religion.

The Spaccos and Aryas have also been attacked and ridiculed in newspaper columns in *The Enterprise*, a Brockton newspaper, and in *The Boston Herald*.

The First Amendment, of course, protects people against only government conduct. It does not—and could not effectively—proscribe personal bigotry. As the Supreme Court suggested in *Lemon*, however, the First Amendment is intended in part to limit the possibility that state action

---

this case reinforces the result which would be reached if the lease were considered only facially.

**3.** Determining a public school curriculum is plainly a governmental function. Thus, the instant case differs from those in which the *Larkin* principles were not violated because it was

found that the functions at issue were religious rather than governmental. *See American Civil Liberties Union v. City of Long Branch*, 670 F.Supp. 1293, 1297 (D.N.J.1987); *Turner v. Parsons*, 620 F.Supp. 138, 142 (E.D.Pa.1985), *aff'd*, 787 F.2d 584 (3rd Cir.), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2280, 90 L.Ed.2d 722 (1986).

will spark or seem to sanction expressions of such bigotry. It appears that defendants have failed to recognize this.

### B. *Irreparable Harm*

As defendants recognize, "the loss of First Amendment freedoms for even minimial periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Thus, there is in this case no adequate remedy at law for the constitutional violation which plaintiffs have shown they are likely to prove. *See also Keefe v. Geanakos,* 418 F.2d 359, 363 (1st Cir.1969); *A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1116 (D.C.Cir.1969). In addition, the threat of irreparable harm is imminent because school will re-open in about two weeks.

### C. *Balancing of the Hardships*

The harm which will occur if a preliminary injunction does not issue in this case is greater than the injury to defendants if the injunction is granted. As the Supreme Court has stated:

> [I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality which is today a trickling stream may all too soon become a raging torrent and, in the words of [James] Madison, "it is proper to take alarm at the first experiment on our liberties."

*Abington School District,* 374 U.S. at 225, 83 S.Ct. at 1573. *See also Stone,* 449 U.S. at 42, 101 S.Ct. at 195; *American Civil Liberties Union of Georgia,* 698 F.2d at 1111.

At the same time, the plaintiffs as well as the court recognize that the education of school children is very important and any disruption of that education ought to be minimized. A preliminary injunction closing of the Parish Center two weeks before school is scheduled to open would undoubtedly present difficulties for the Town.[4]

It is, however, premature to address the question of ending the use of the Parish Center as a public school. As a practical matter, plaintiffs have not urged the court to enjoin preliminarily the opening of the school at the Parish Center. Rather, they request that the plaintiff children be immediately reassigned to another school while discovery and further proceedings are conducted to determine when the use of the St. Thomas Aquinas Parish Center can reasonably be ended; such discovery is now being conducted. Merely accommodating plaintiffs by reassigning the two students who have brought this case will not be an adequate remedy if an enduring Establishment Clause violation is found when this case is decided on the merits. *See Abington School District,* 374 U.S. at 224–25, 83 S.Ct. at 1573 (The fact that students may absent themselves from bible readings furnishes no defense to unconstitutionality under the Establishment Clause); *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962). The immediate reassignment of the two plaintiff students is, however, the action to be considered in balancing the potential hardships involved in the pending request for preliminary injunction.

Defendants acknowledge that the immediate reassignment of the two plaintiff students would not be a hardship for the Town. Thus, the harm to the plaintiffs if the students are not now reassigned substantially outweighs any injury to defendants if reassignment is ordered.

### D. *The Public Interest*

The public interest will also be served by the issuance of the requested preliminary injunction. The Religion Clauses of the First Amendment reflect policies of fundamental importance to our nation. School officials in cities and towns throughout the United States have a responsibility to understand the values and purposes of the First Amendment. In the midst of a budgetary crisis or other practical problems, local officials may lose sight of their re-

---

**4.** The court notes, however, that if the Church deemed the continuous teaching at the Parish Center to be inconsistent with Roman Catholic doctrine it could evict the Town on fourteen days notice, and the lease will terminate immediately if Article IV, Section 6 is declared invalid.

sponsibilities under the First Amendment. This, however, is impermissible and unacceptable. As Justice Robert Jackson wrote:

The [Constitution] protects the citizens against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discrectionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to ... teach youth to discount important principles as platitudes.

*West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 637–38, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

The preliminary injunction issued in this case should serve the public interest by reminding officials of Bridgewater, and perhaps others similarly situated, of their paramount First Amendment obligations in the important area of public education.

III. *Future Proceedings*

In view of the foregoing, plaintiffs are entitled to the preliminary equitable relief they are seeking—the reassignment of the plaintiff children before school reopens in early September, 1989. Thus, defendants are being ordered to inform plaintiffs of such reassignments by August 28, 1989.

In addition, plaintiffs have moved for summary judgment. The court previously deferred defendants' response pending a decision on the motion for preliminary injunction. It is, therefore, now appropriate for the defendants to inform the court whether in light of this decision there are in their view identifiable, material facts which may be in dispute and, if so, whether any further discovery is requested.

IV. *Order*

For the reasons previously stated, it is hereby ORDERED that:

(1) The defendants Bridgewater School Department, the Bridgewater School Committee, Nancy Kranes, in her official capacity as the Chairperson of the Bridgewater School Committee, and her succesors in office, William McArthur, Mary Ellen Arabarz, Louis Resmini, Richard Bradley, Timothy Millerick, and Barbara Cook, in their official capacities as members of the Bridgewater School Committee and their successors in office, and the Town of Bridgewater are preliminarily enjoined from assigning Louis Spacco, III and Nupur Arya to public school classes which meet in the St. Thomas Aquinas Parish Center. Defendants shall by August 28, 1989, inform the plaintiff parents of their childrens' reassignment for the 1989–90 school year.

(2) Plaintiffs shall promptly give security pursuant to Fed.R.Civ.P. 65(c) in the amount of one dollar.

(3) Defendants shall by August 29, 1989 inform the court whether there are, in their view, disputed facts which are material to determining the merits of plaintiffs' claim that defendants' conduct violates the Establishment Clause of the First Amendment; identify at least some such facts; and state whether further discovery is requested. Plaintiffs shall respond to this submission by August 31, 1989. The discovery concerning the possible closing of the Parish Center as a public school shall continue on the schedule established on August 16, 1989.

(4) A scheduling conference will be held on September 6, 1989 at 2:00 p.m.