**Louis J. SPACCO, Jr., et al., Plaintiffs,**

v.

**BRIDGEWATER SCHOOL DEPARTMENT, et al., Defendants.**

**Civ. A. No. 89–883–Wf.**

United States District Court, D. Massachusetts.

June 6, 1990.

Frances S. Cohen, Linda G. Bauer, Hill & Barlow, John Reinstein, Mass. Civ. Liberties Union, Boston, Mass., for plaintiffs.

Robert G. Clark, III, Brockton, Mass., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. *Summary*

This case presents the question whether the lease of the St. Thomas Aquinas Parish Center from the Archbishop of Boston, and the manner of its use as a public elementary school violates the Establishment Clause of the First Amendment of the United States Constitution. The parties have submitted a proposed settlement that they have asked the court to enter as a Consent Decree in the form attached hereto. It is generally desirable that cases in this sensitive area concerning the relationship of church and state be resolved, on appropriate terms, by agreement. The terms of the proposed settlement are reasonable. Accordingly, the proposed Consent Decree will be entered as an Order of this court.

### II. *Procedural History*

The present plaintiffs are Louis Spacco, III, an elementary school student in the Town of Bridgewater, Massachusetts and his parents, Mr. and Mrs. Louis Spacco, Jr. In the summer of 1989, Louis Spacco, III was assigned to attend, for a second year, elementary school at the St. Thomas Aquinas Parish Center, which was leased by the Town of Bridgewater from the Archbishop of Boston, a corporation sole. Plaintiffs promptly filed a motion for preliminary injunction seeking the reassignment of Louis, III. They also requested a permanent injunction prohibiting the rental of the Parish Center, at least on the existing terms of the lease, as well as declaratory relief, costs and attorneys' fees.

After intensive briefing and hearings necessitated by the imminence of the new school year, this court found in August, 1989 that plaintiffs had established a reasonable likelihood that they would prevail on their claims that the terms of the lease and manner of the use of the Parish Center violated the "primary effect" and "entanglement" prongs of the test, established by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), for determining the constitutionality of conduct challenged under the Establishment Clause. *Spacco v. Bridgewater School Department*, 722 F.Supp. 834 (D.Mass.1989). The court recognized that merely accommodating plaintiffs by reassigning the student who brought the case would not be an adequate remedy if an enduring Establishment Clause violation was proven. *Id.* at 848 (citing *Abington School District v. Schempp*, 374 U.S. 203, 224–25, 83 S.Ct. 1560, 1572–73, 10 L.Ed.2d 844 (1963)). This was, however, the sole preliminary equitable relief that plaintiffs requested. *Id.* Thus, the court ordered Louis Spacco, III reassigned for the 1989–90 school year and established a schedule intended to achieve a prompt determination of the merits of the case.

Plaintiffs filed a motion for summary judgment on their requests for permanent injunctive and declaratory relief. These motions were scheduled to be fully briefed by mid-October, 1989. In early October, 1989, however, the Bridgewater School Committee made several changes in the lease and use of the Parish Center which addressed some of the factors that influenced the court to find a reasonable likelihood of an Establishment Clause violation when deciding the motion for preliminary injunction.

The School Committee, among other things, renegotiated key provisions of the lease for the Parish Center. The original lease provided that the Town's use of the Parish Center would "at all times be consistent with the teachings of the Roman Catholic Church enunciated by the Holy Father and Bishops in communion with him," and further stated that "[i]n this regard the parties [would] rely upon and defer to the teaching authority of the Roman Catholic Archbishop of Boston." *Id.* at 836. The original lease also provided that the Archbishop could terminate the rental on fourteen days notice if this "Catholic teachings" clause was violated and that the lease would terminate automatically if the clause was found invalid or unenforceable. *Id.* The renegotiated rental agreement provided that either party could ter-

minate the lease without cause, for any reason, on thirty days notice.

In addition, the Bridgewater School Committee altered the manner in which the Parish Center was used with regard to several matters which were addressed in the court's decision concerning the motion for preliminary injunction. For example, the School Committee directed that the students enter the building through a side door, rather than through the front entrance under a large cross; that the students no longer walk to the play area through the cemetery, which is replete with crosses, religious statues, and religious sayings; and that the inside of the building be checked daily to assure that no religious articles or messages were exposed to the children. *See id.* at 836–37.

After revising the lease and the manner in which the Parish Center was utilized, defendants moved to dismiss the case as moot. The developments concerning the lease and use of the Parish Center necessitated further briefing regarding plaintiffs' motion for summary judgment and defendants' request that the case be dismissed as moot. A hearing on the motions was subsequently held. Decision of the motions was deferred, in part to permit the parties to explore the possibility of settlement.

After efforts to settle the case failed, the court denied defendants' motion to dismiss the case as moot. The court also denied plaintiffs' motion for summary judgment. As explained in the court's Memorandum and Order dated March 14, 1990, the issues then remaining to be litigated included, but were not limited to: (1) whether the original lease requiring that use of the premises be consistent with the teachings of the Roman Catholic Church was the functional equivalent of the vesting of governmental power in a religious institution found to be impermissible in *Larkin v. Grendel's Den,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); (2) if so, whether the renegotiated lease cured this defect; and (3) whether the lease and manner of using the Parish Center conveyed the impermissible message that religion or a particular religion is offi-cially preferred by the Town of Bridgewater. *See County of Allegheny v. American Civil Liberties Union,* —— U.S. ——, 109 S.Ct. 3086, 3115, 106 L.Ed.2d 472 (1989); *Spacco,* 772 F.Supp. at 840.

The parties were allowed to conduct the additional discovery necessary to prepare the case for trial. Trial was scheduled to commence in May, 1990, with a view to having the case decided in time to permit the orderly assignment of the school children who would be affected by the outcome of the case.

In preparing for trial, however, the court perceived that very recent developments raised questions concerning whether plaintiffs' request for permanent injunctive relief had become moot and whether their request for declaratory relief had become so abstract as to be inappropriate for adjudication. More specifically, the court learned that because of the fiscal crisis being experienced by the Commonwealth of Massachusetts and its cities and towns, it appeared that Bridgewater probably would not have the funds necessary to lease the Parish Center for the 1990–91 school year and that the possibility of its rental for the following school year was also uncertain. Thus, exercising its authority under Federal Rule of Evidence 611(a) to control the order of interrogating witnesses and presenting evidence, the court ordered that the first phase of the trial be limited to evidence concerning whether the case had become moot or otherwise not justiciable.

The trial commenced in late May, 1990. The defendants then claimed the case was moot. Plaintiffs disagreed and reasserted their entitlement to injunctive and declaratory relief.

The court heard testimony from the members of the Bridgewater School Committee, the Superintendent of the Bridgewater Schools, and Louis Spacco, Jr. The court also, by agreement of the parties, considered the deposition testimony of Father Frederick J. Ryan, who had been designated to speak on behalf of the Archbishop of Boston for the purposes of this case. The foregoing evidence indicated to the court that, among other things, plaintiffs

still had a reasonable likelihood of prevailing on at least one of their Establishment Clause claims if the case was not moot.

More specifically, according to Father Ryan, the provision of the renegotiated lease permitting the Archbishop of Boston to terminate the rental of the Parish Center for any reason on thirty days notice had the same purpose as the earlier provision authorizing termination on fourteen days notice if the premises were not used in a manner consistent with the teachings of the Roman Catholic Church. Deposition of Father Frederick J. Ryan at 32 (March 26, 1990). The purpose of both provisions, one form of which is included in all leases of property by the Archbishop of Boston, is to "prevent public scandal." *Id.* at 33. In this context, a "public scandal" would be use of Church property, including the Parish Center, in a fashion contrary to basic Roman Catholic doctrines and values. *Id.* at 34–36.

In view of the foregoing, it became evident to the court that even assuming, without deciding, that the revisions of the lease and the manner in which the Parish Center was being used by Bridgewater resolved the "primary effect" prong issues addressed by the court in granting the motion for preliminary injunction, *Spacco*, 722 F.Supp. at 839–43, the "entanglement" prong analysis, *id.* at 844–47, was not materially affected. Thus, there still appeared to be a reasonable likelihood that, in the particular circumstances of this matter, plaintiffs would prevail on their claim that the revised lease of the Parish Center violated the Establishment Clause, if the case was not moot.

■■■■■ With regard to mootness, the court and the parties recognized that a case seeking only equitable and declaratory relief is not moot if a defendant has voluntarily, but not necessarily permanently, ceased its allegedly unconstitutional conduct. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Rather, defendants bear a "heavy burden," to demonstrate that "there is no reasonable expectation" that the alleged wrong will be repeated. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897; *see also City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 1074 n. 10, 71 L.Ed.2d 152 ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"). In addition, it was recognized that it is inappropriate to dismiss a case as moot if the issue it presents is a recurring one which will nonetheless evade ordinary review. *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

The evidence at the trial of phase one of this case clearly suggested that, primarily for financial reasons, there is no reasonable expectation that the Parish Center will be leased by Bridgewater for the 1990–91 school year. Rather, efforts are already under way to reassign the students who would otherwise attend public school at the Parish Center next year.

The evidence also revealed several formidable factors tending to suggest that the Parish Center will not be leased by Bridgewater for the 1991–92 school year. These factors include: (1) the expectation that the present fiscal crisis will persist, preventing the Town from having the funds necessary to permit consideration of the leasing of the Parish Center; (2) the development for adoption by the School Committee of a new long-range plan concerning space, which does not include use of the Parish Center; (3) the consideration by the Archbishop of Boston of the possibility of using the Parish Center for a parochial school beginning in 1991; and (4) the recent demonstration of a keen respect by Bridgewater officials for First Amendment values and the problems that can arise if they are not sensitive to them, which should cause those officials to be cautious about attempting to utilize the Parish Center as a public school again.

Nevertheless, the members of the School Committee each also testified that they would seriously consider leasing the Parish Center again if, unexpectedly, the neces-

sary funds became available next year. It was also evident that if this case was dismissed as moot and a decision to lease the Parish Center was made shortly before the beginning of the next school year, it would be difficult, if not impossible, for a new case to be filed, prepared, presented, and decided in a timely fashion. Thus, the court perceived a close question on the issue of mootness, the decision of which would require a prediction concerning events which might occur a year or more in the future.

As disclosed to the parties in the course of questions by the court to several members of the School Committee, however, it seemed doubtful to the court that this case should continue to be tried now, on what is in effect an expedited basis, even if the matter was not moot. The case was scheduled for a trial this spring on the assumption that it would be in the public interest for the court to render a decision before it was necessary for Bridgewater to make assignments concerning the children who might attend school at the Parish Center in September, 1990. It is now clear, however, that regardless of the outcome of this case, no children will be attending public school at the Parish Center in the 1990–91 school year.

Therefore, as also disclosed in the course of the court's questioning of members of the School Committee, the court was seriously considering: (a) modifying the preliminary injunction to prohibit use of the Parish Center as a public school without further order of the court; and (b) staying this litigation for about a year to monitor the evolution of the now uncertain factors which relate to the question of mootness. The court also suggested that the parties consider whether a mutually agreeable settlement based on these principles might be reached.

The parties promptly negotiated a settlement incorporating and amplifying the foregoing principles. It is this settlement which the court has been asked to effectuate by entry of the attached Consent Decree.

### III. *The Consent Decree*

The proposed Consent Decree has several salient features. Defendants do not admit liability. The Consent Decree, however, provides for a preliminary injunction prohibiting the use of the Parish Center during the 1990–91, 1991–92, and 1992–93 school years. If it evolves that Bridgewater wishes to have the preliminary injunction dissolved or modified, it may request renewed consideration of this case by presenting to the court, no later than four months prior to its commencement date, a proposed lease of the Parish Center in a form which is acceptable to defendants and to the Archbishop of Boston. Unless there is active litigation arising out of the Consent Decree pending at the conclusion of the 1992–93 school year, this case will be dismissed with prejudice. In addition, defendants shall pay plaintiffs costs and attorneys' fees in the amount of $12,500. As part of the settlement, the parties will also develop a mutually agreeable program concerning the Religion Clauses of the First Amendment for appropriate students of the Bridgewater Public Schools. In return, defendants will receive a release of all claims except those which may arise out of breach of the Consent Decree.

### A. *Settlement of Constitutional Controversies Is Generally Desirable*

There are compelling considerations, reflected in the architecture of our government, which indicate that it is usually preferable that constitutional controversies concerning the conduct of public officials be settled on appropriate terms, rather than decided by the courts. Courts have an essential role in enforcing the limitations of the Bill of Rights. Courts, however, are not the sole department of government responsible for interpreting and enforcing these limitations. Rather, legislative and executive officials are charged in the first instance with the duty of constitutional interpretation.

The separation of powers which characterizes our government is based upon the understanding that shared responsibility serves to safeguard liberty. *See Myers v.*

*United States*, 272 U.S. 52, 93–95, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). Thus, there are prudential considerations which should cause federal courts to be careful—not timid, but careful—when asked to determine the constitutionality of the conduct of local school officials, among others. Ultimately, the judiciary may have to resolve intractable controversies by deciding whether other public officials have violated the Constitution. Courts, however, should understand that in some cases the values to be protected by the Bill of Rights may best be served when other officials are required to recognize and wrestle with their responsibilities for constitutional interpretation. As a corollary of this, judges should realize that they may often best serve constitutional interests by encouraging the responsible public officials and their constituents to settle constitutional controversies on proper terms, rather than by deciding the questions such controversies present.

More particularly, it is axiomatic that courts have an important role in protecting civil rights in our democratic, federal form of government. In the United States, the powers of government are derived from the people. Courts perform the vital function of assuring that government officials do not exceed the limited powers delegated to them. *See Marbury v. Madison*, 1 Cranch 137, 176, 2 L.Ed. 60 (1803); A. Hamilton, *The Federalist* No. 78 (1788).

The Bill of Rights enumerates civil rights and liberties retained by the people which courts must be vigilant to protect. As Justice Robert Jackson wrote, "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). Expressly among these rights is the freedom of religion guaranteed by the First Amendment.

Courts should recognize, however, that they are not the only department of government charged with interpreting and enforcing constitutional limitations. As Justice Felix Frankfurter—explicitly echoing Justice Oliver Wendell Holmes, Jr.—emphasized in his dissent in *Barnette*, state and local officials, like judges, have a duty to observe the Constitution and share with the courts responsibilities as ultimate guardians of the liberties of our people. 319 U.S. at 649, 667, 63 S.Ct. at 1190, 1198 (Frankfurter, J., dissenting).

Local officials, of course, also have other important responsibilities. Local school committees discharge the public duty of educating our nation's youth to become effective citizens and productive workers. *See Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2396–97, 72 L.Ed.2d 786 (1982); *Wisconsin v. Yoder*, 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972). As is indicated by this case, involving local school officials faced with a choice between crowded classrooms or renting a church building to use as a public school, this responsibility often presents difficult dilemmas.

Local school officials must perform their "important, delicate and highly discretionary functions within the limits of the Bill of Rights." *Barnette*, 319 U.S. at 637, 63 S.Ct. at 1185. Courts may at times perform a necessary and valuable function by reminding local school officials, among others, of their constitutional responsibilities in the course of deciding, preliminarily or finally, matters in which it is correctly claimed that constitutional limits have been exceeded.

Judicial review, however, also has the potential to weaken the sense of responsibility of the political branches for enforcing constitutional limitations. This potential is most likely to be realized if judicial review is invoked too easily or too often. The ready availability of judicial decisions concerning constitutional questions may mistakenly suggest to other officials that the courts are solely responsible for seriously considering the constitutionality of their conduct. The prospect of judicial review may also encourage public officials to abdicate their responsibilities to determine and

respect constitutional limits in difficult or politically controversial cases. In this sense, judicial review may injure our democracy, which depends in part on citizens and their representatives laboring in each generation to understand and thus revitalize what they have inherited.

There are, therefore, implicit in this and similar cases tensions between valid principles concerning the proper role of the courts in constitutional controversies. Recognition of these tensions suggests that courts should carefully consider whether it is truly necessary to resolve them by deciding claims that public officials have violated the Constitution.

As Justice Louis Brandeis explained, the Supreme Court has often, although not always, applied for the governance of its discretionary authority the rule that it will not decide constitutional questions unless absolutely necessary to the resolution of the case. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–83, 80 L.Ed. 688 (Brandeis, J., concurring). District courts, as courts of general federal jurisdiction, may not always be in a position to follow the same rule. At times proper judicial administration may make it necessary for a district court to address constitutional issues, as well as other bases for decision. This may be required to determine the rights and responsibilities of the affected parties; to complete the record for appellate review in order to minimize the possibility of protracted, piecemeal litigation; and to provide for the parties and any reviewing court the unique insights which the trial of a case often affords concerning constitutional, as well as other issues. As Professor Alexander Bickel wrote:

> There are crucial differences ... between the role of the Supreme Court in constitutional cases and the function of courts of general jurisdiction. The latter sit as primary agencies for the peaceful settlement of disputes and, in a more restricted sphere, as primary agencies for the vindication and evolution of the legal order. They must, indeed, *resolve* all controversies within their jurisdiction, because the alternative is chaos.

A. Bickel, *The Least Dangerous Branch* 173 (1962) (emphasis added).

However, while federal district courts must *resolve* all controversies properly presented to them, this does not mean that it is necessary or most appropriate that they *decide* all such cases. The principles relating to the separation of powers and federalism which have often influenced the Supreme Court not to decide constitutional questions unnecessarily should also influence a district court to encourage the parties to explore fully the possibility of a settlement on proper terms before deciding a constitutional question. Thus, this court continuously encouraged the parties to seek an appropriate settlement of this case.

**B.** *The Settlement is Fair to the Parties*

 The proposed Consent Decree is the result of arduous litigation and strenuous negotiation. The integrity of the process which produced the proposed settlement indicates that it is fair to the parties. This view is confirmed by analysis of the terms of the settlement.

From the perspective of the plaintiffs, the Consent Decree will assure that the Parish Center will not in the next three years be used by the Town of Bridgewater as a public school without the authorization of the court. This is, in effect, the ultimate relief plaintiffs have been seeking. The Consent Decree also provides a reasonable time for plaintiffs to prepare and present their case in the unlikely event that a proposed new lease for the Parish Center is submitted for assessment by the court. In addition, the termination of this litigation should diminish, if not end, the harassment which plaintiffs have experienced since initiating this case. *See Spacco,* 722 F.Supp. at 847–48.

From the perspective of the defendants, the Consent Decree provides a cost and time-efficient resolution of this matter without altering their present intentions or future options concerning the Parish Center. As indicated earlier, defendants have decided, largely for financial reasons, not

to lease the Parish Center for the 1990–91 school year. It is also unlikely that they could or would seek to use the Parish Center in the several subsequent years. Thus, from the defendants' perspective, the prohibition concerning the lease of the Parish Center included in the Consent Decree does not, as a practical matter, now have an injurious effect. If defendants' desires concerning the Parish Center change and a proposed new lease is negotiated, they can then seek relief from the preliminary injunction.

The Consent Decree also eliminates the risk that the Town of Bridgewater would be held liable for substantial costs and attorneys' fees if this case was litigated to a conclusion. As this case involves an asserted violation of constitutional rights, if plaintiffs ultimately prevailed, they would be entitled to be compensated for their reasonable costs and attorneys' fees. *See* 42 U.S.C. § 1988. Plaintiffs' counsel recently represented that their time and expenses already exceed $200,000. This amount would increase significantly in the course of a lengthy trial. In view of the court's earlier finding that plaintiffs had demonstrated a reasonable likelihood of success on the merits, the $12,500 defendants have agreed to pay as part of this settlement represents a prudent means of insuring against the possibility of a monetary award that the financially distressed Town of Bridgewater would find difficult to pay.

The settlement of this case will also allow the School Committee to give its undivided attention to immediate educational issues. The School Committee is composed of part-time, elected officials. They have limited time in which to perform their important functions. This case has consumed a great deal of their attention in the past year. At least since the initial decision on the motion for preliminary injunction, the defendants have earnestly endeavored to meet their responsibilities under the First Amendment without unnecessarily compromising the educational interests of the children of Bridgewater. This has been a challenging and time-consuming task. The settlement of this case will permit the School Committee to focus on other critical issues, including the fiscal plight of the Bridgewater schools.

## C. The Consent Decree Will Serve The Interests of the Administration of Justice

As indicated earlier, it is often desirable that cases presenting constitutional questions be resolved, on proper terms, by agreement of the parties. The present posture of this case makes the settlement now proposed particularly appropriate.

Arguably, this action may not be moot because the issues it presents could recur at a time which would make them difficult, if not impossible, to review effectively and finally in a timely manner. *Southern Pacific Terminal Co.,* 219 U.S. at 515, 31 S.Ct. at 283. Nevertheless, it appears that permanent injunctive relief would now be unwarranted because the cancellation of the lease of the Parish Center means there is no longer the required threat of imminent, irreparable harm. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897. Similarly, the cancellation of the existing lease and the uncertainty concerning the precise terms of any future lease raise doubts concerning the propriety of the declaratory relief plaintiffs have been seeking. *See Poe v. Ullman,* 367 U.S. 497, 508–09, 81 S.Ct. 1752, 1758–59, 6 L.Ed.2d 989 (1961); *Rescue Army v. Municipal Court,* 331 U.S. 549, 575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

In the present circumstances of this case, an adjudication of the merits would be substantially, if not exclusively, advisory. This is not the most appropriate role for a federal court in a case such as this. As indicated earlier, local school officials have an obligation to decide how their responsibilities for providing quality education can be performed consistent with the Constitution. It is preferable that these democratically accountable officials be required, in the first instance, to consider constitutional limitations, among other things, and adopt a course of action. This is, in part, because there may be more than one constitutionally permissible means of discharging their public duties. In addition, requiring that

38

such officials seek to resolve constitutional questions may have the salutary effect of strengthening their long-term ability to do so because, "as Brandeis believed, responsibility is the great developer of men" and women. P. Freund, *On Law and Justice* (1968) at 131.

Thus, the settlement in this case recognizes the appropriate relative roles of the Bridgewater School Committee and of this court. If in the next several years the School Committee decides it would again like to lease the Parish Center, it may decide whether it believes there are constitutionally acceptable terms on which the facility could be rented and may seek to negotiate such a lease with the Archbishop of Boston. If any such effort succeeds, the court will be presented with the precise terms of the proposed lease. It will then be in a position to perform its most appropriate function—deciding specific controversies with real consequences and, if necessary, determining whether local officials have exceeded constitutional limits, rather than advising them concerning their possible options.

The terms of the Consent Decree are in another respect consistent with the limited appropriate role of the federal judiciary in matters involving local schools. The Consent Decree is for a finite and reasonable period of time—three years. It does not contemplate continuous supervision by this court of decisions ordinarily within the discretion of the Bridgewater School Committee. This court would have resisted accepting a proposed Consent Decree of uncertain or extended duration. The parties, however, have struck an appropriate balance between plaintiffs' legitimate concerns for their constitutional rights and defendants' interest in not unduly impairing their discretion to perform their public responsibilities. It is appropriate for the court to retain jurisdiction of this matter for three years in order to effectuate this balance.

The foregoing considerations alone indicate that the proposed Consent Decree is in the interests of the administration of justice. It will, however, also serve the administration of justice in another respect. This settlement will permit this court, and perhaps at least the Court of Appeals, to give more prompt attention to other matters. This court is now assigned about four hundred civil and criminal cases. Some are urgent; many involve poignant problems; all are important to the litigants. This court had planned to devote much of this month to trying and deciding this case. This time can now be dedicated to matters with more immediate consequences to the parties.

D. *The Settlement Will Serve the Public Interest in Another Respect*

The Consent Decree includes another term which is likely to serve the public interest. At the court's suggestion, in lieu of a more substantial cash payment to plaintiffs for costs and attorneys' fees, the parties have agreed to present a program on the Religion Clauses of the First Amendment to students in the Town of Bridgewater. This provision of the settlement has the potential to add redeeming value to the painful controversy which this litigation has both reflected and engendered.

As Justice Brandeis observed, "Our Government is the potent, the omnipresent teacher." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (Brandeis, J., dissenting). As Justice Jackson wrote, reflecting this same insight, the fact that school officials "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to ... teach youth to discount important principles of our government as platitudes." *Barnette*, 319 U.S. at 637, 63 S.Ct. at 1185.

Undoubtedly, many of the youth of Bridgewater are aware of this case. They will inevitably learn lessons from it. The program to be presented pursuant to this settlement should contribute to assuring that the lessons taught are informed, thoughtful, and appropriate.

## IV. *Order*

For the foregoing reasons, it is desirable that this case be settled and the terms agreed upon are proper. Accordingly, the attached Consent Decree is hereby entered as an Order of this Court.

### APPENDIX

### CONSENT DECREE

The parties stipulate and agree as follows:

1. Defendants and plaintiffs agree to the continuation in force of a preliminary injunction modifying the existing preliminary injunction to bar the defendants from using the Parish Center during school years 1990–1991, 1991–1992 and 1992–1993. Provided, however, that the defendants may seek to modify this injunction by application to this Court by presentation of a lease for its review in a form acceptable to defendants and to the Archbishop of Boston, a Corporation Sole, by no later than four months prior to the commencement date of the lease.

2. Unless there is active litigation arising out of the consent decree pending, the preliminary injunction as modified shall be dissolved and the case will be dismissed with prejudice on June 4, 1993.

3. The defendants shall pay the plaintiffs' costs and attorneys fees in the amount of $12,500.00 in full satisfaction of all claims and demands upon delivery to the defendants of a release duly executed by the plaintiffs in the form, style and substance of attached "A". The defendants shall deliver to the plaintiffs a cross-release in the form, style and substance of attached "B".

4. The parties will present a mutually agreeable program for appropriate students in the Bridgewater Public Schools regarding the religion clauses of First Amendment.

5. This Consent Decree and compliance with the terms set forth herein by the defendants shall not be construed as an admission of liability or of any of the allegations or claims of the Complaint which are expressly denied by the defendants.

(s) Linda G. Bauer
Frances S. Cohen
Linda G. Bauer
HILL & BARLOW
John Reinstein
MASSACHUSETTS CIVIL LIBERTIES UNION
Attorneys for All Plaintiffs

(s) Robert G. Clark, III/LGB
Robert G. Clark, III
CLARK, BALBONI & TUFANKJIAN
Attorney for All Defendants

DATED: May 31, 1990