**CONVERSE CONSTRUCTION COMPANY, INC.,**
Plaintiff,

v.

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,**
et al., Defendants.

**Civ. A. No. 95–11372–MLW.**

United States District Court,
D. Massachusetts.

Aug. 15, 1995.

Order Dismissing Case
Sept. 13, 1995.

Michael Savage, Office of Michael Savage, Scituate, MA, Jack E. Robinson, Stamford, CT, for Converse Construction Company, Inc.

Jonathan P. Feltner, Boston, MA, Mary Logalel, MBTA Law Department, Boston, MA, for Massachusetts Bay Transportation Authority.

Susan M. Poswistilo, United States Attorney's Office, Boston, MA, Richard S. Ugelow, U.S. Dept. of Justice, Washington, DC, for Federico F. Pena.

Richard C. Heidlage, Heidlage & Reece, Boston, MA, Stanley Silas, Massachusetts Port Authority, Boston, MA, for Mass Port Authority.

Steven H. Wright, Chin, Wright & Branson, P.C., Boston, MA, for Massachusetts Turnpike Authority.

John W. Bishop, Jr., Massachusetts Water Resources Authority, Boston, MA, for Mass Water Resource.

John E. Bowman, Attorney General's Office, Boston, MA, Catherine C. Ziehl, Assistant Attorney General, Boston, MA, for Massachusetts Highway Department, State Office of Minority and Women Business Assistance.

Ozell Hudson, Jr., Lawyers' Committee for Civil Rights, Boston, MA, for Atlantic Masonry Co.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Attached is a memorandum based upon the transcript of the decision rendered orally on August 4, 1995, denying plaintiff Converse Construction Company, Inc.'s ("Converse") motion for preliminary injunction concerning certain public contracts scheduled to be awarded by the Massachusetts Highway Department ("MHD"). This memorandum adds citations, deletes some colloquy, and clarifies some language. The court recommends this memorandum as the most accurate and complete statement of the reasons for the decision concerning the Massachusetts Highway Department contracts rendered on August 4, 1995.

The transcripts of the lengthy August 2, 1995 hearing and the August 4, 1995 proceedings are also being prepared and may be acquired from the court reporter.

\* \* \*

### I. Introduction

With regard to the motion for preliminary injunction, I am going to address now in considerable detail only the Massachusetts Highway Department contracts that were discussed on August 2, 1995. The first contract is denominated C12A3 and concerns work relating to Massachusetts Avenue. Bids are scheduled to be opened today, August 4, 1995. It is a $180,000,000 contract.

The second contract immediately at issue is the Massachusetts Highway Department's contract denominated CO9B3. It is a $110,000,000 contract relating to the Fort Point Channel that is due to be opened August 15, 1995.

Later today I will separately and much more briefly address the motion to reconsider the denial of the preliminary injunction concerning the Massachusetts Bay Transportation Authority's ("MBTA") Green Line contract for $91,000,000 that was opened after I denied the motion for preliminary injunction on June 27, 1995, and which will be awarded on August 9, 1995.

The two Massachusetts Highway Department contracts to be opened or awarded imminently must be addressed today. Each of them relates to the Central Artery and Harbor Tunnel ("CA/T") project.

The plaintiff has requested a preliminary injunction regarding other possible contracts by the Massachusetts Highway Department, the MBTA, and contracts which may be issued by the Massachusetts Port Authority ("Massport"), the Massachusetts Turnpike Authority ("MTA") and the Massachusetts Water Resources Authority ("MWRA").

The plaintiff in its memoranda claims that all of those entities use what the plaintiff calls the "Mass. Plan" to set aside a percentage of public construction contracts for minority and women business enterprises, and

that such set-asides violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. However, it clearly emerged at the August 4, 1995 hearing that there is no single "Mass. Plan" applicable to all of the defendants or to all of the contracts whose award plaintiff seeks to enjoin or alter.

Rather, the various defendants have different programs. Some of the agencies may also use different standards at different times depending on whether federal funds are involved in the contract at issue. Factual distinctions with regard to defendants, programs, and contracts may be material to whether the plaintiff is entitled to a preliminary injunction regarding any particular contract.

The plaintiff has not addressed all of the relevant facts in its submissions. Therefore, I will rule now only on the two imminent Massachusetts Highway Department contracts. I will rule later today on the MBTA Green Line contract. These were the matters that were discussed at length at the hearing on August 2, 1995.

Following my decisions today, I will meet with the parties and discuss the scheduling of any possible further hearings regarding other contracts, and also will discuss the disposition of the motion to enjoin the operation of the Massachusetts State Office of Minority and Women Business Assistance ("SOMWBA").

I will say at the outset, to alleviate any avoidable suspense, that the motion for a preliminary injunction regarding the opening of bids and award of Massachusetts Highway Department contracts C12A3 regarding Massachusetts Avenue and CO9B3 regarding the Fort Point Channel is being denied. In addition, I have decided to deny again the motion to enjoin the award of the Green Line contract by the MBTA.

I am deciding this matter orally because it is urgent. The Massachusetts Highway Department has delayed the Massachusetts Avenue contract bid opening by two weeks in order to permit the briefing and hearing that

has been essential to an informed decision. The evidence persuades me, however, that each week of delay costs about $118,000 concerning that project. It also imposes delay and additional costs on related aspects of the CA/T project. Such delays are not only costly, they also inconvenience people who depend on the Greater Boston transportation system, which is disrupted during this period of construction.

As I hope the degree of detail of this decision will reveal, the fact that it is being announced orally should not suggest that it has been reached casually.

## II. *Findings of Fact*

I find the following facts to have been proven by the evidence.

Converse Construction Company is a steel contractor. Converse claims to be a minority-owned business—that is a business at least 51 percent owned and actually controlled by Jack E. Robinson, an African American.

Until September 1993, SOMWBA had certified Converse as a Disadvantaged Business Enterprise ("DBE") under federal law and as a Minority Business Enterprise ("MBE") under state law. As a certified DBE, Converse was eligible to benefit from federal programs that seek to assure that at least ten percent of the federally funded construction projects go to DBEs as prime contractors or subcontractors. As a certified MBE, Converse was eligible to benefit from the various set-aside programs established by Massachusetts law for certain state-funded contracts.

While it was a beneficiary of these programs, Converse received public contracts and subcontracts worth many millions of dollars. For example, Converse received about $13,000,000 worth of public contracts from the MWRA alone. As a beneficiary of federal and state DBE and MBE programs, Converse built its business considerably. Converse now claims to be the twenty-sixth largest specialty contractor in New England and the lowest cost steel contractor, minority or non-minority, in Massachusetts.[1]

---

**1.** *See* Am.Comp. ¶ 6.

The Massachusetts Highway Department relies on SOMWBA to determine which entities qualify as DBEs under federal law and as MBEs under state law. The federal standards applied by SOMWBA are contained in 49 C.F.R., Part 23. The Massachusetts Highway Department uses different standards for its affirmative action program on contracts which are funded solely with state funds. As I will discuss in more detail later, federal law requires that federal standards be used with regard to all contracts which are funded in part with federal funds.[2]

Officials of the Massachusetts Highway Department and SOMWBA are aware that they have distinct obligations under federal and state law. This understanding is manifest in the affidavits of Patricia O'Brien, the Director of the Massachusetts Highway Department Office of Civil Rights, and of Brian Price, the general counsel of SOMWBA.[3] In addition, SOMWBA prepares and maintains separate directories of companies certified as DBEs under federal law and as MBEs or Women's Business Enterprises ("WBE") under state law. The same organization may qualify as a DBE under federal law and as an MBE under state law, as Converse did until September 1993.

In September 1993, SOMWBA determined that Converse was not truly owned and controlled by Jack E. Robinson, or any other African American. Rather, SOMWBA decided that Robinson was merely a "straw" or a "front" for white male investors. Federal law requires that an enterprise be really, substantially, and continuously owned by minorities to be eligible for the benefits provided to MBEs under the federal affirmative action program at issue in this case.[4] Massachusetts law requires that minorities own 51 percent of a company, and truly control it, to benefit from a state MBE program.[5] In addition, under Massachusetts law, a company is ineligible if found to have been established solely to take advantage of a special program to benefit minorities.[6]

Recognizing the distinction between federal and state programs, SOMWBA sent Converse two letters on September 30, 1993. The first letter informed Converse that it was decertified as an MBE under state law and could challenge that decision in the manner provided by Massachusetts law.[7] The second letter notified Converse that it was decertified as a DBE for failing to meet the requirements of federal law, and that it could appeal that decision to the United States Department of Transportation.[8]

Converse challenged its decertification under state law in the Superior Court of the Commonwealth of Massachusetts. Summary judgment was granted in SOMWBA's favor. Converse has appealed that decision. The appeal is pending.[9] Single justices of the Massachusetts Appeals Court and the Supreme Judicial Court rejected Converse's request for injunctions relating to that litigation.

Converse also appealed its federal decertification to the United States Department of Transportation. In connection with that appeal, Converse requested a preliminary injunction against the defendants in this case to restrain them from giving effect to SOMWBA's decision to decertify Converse for federal purposes pending review by the Department of Transportation. That case was assigned to United States District Court Judge Douglas P. Woodlock, who denied the preliminary injunction. Converse then dismissed that case.

---

2. *See* 49 C.F.R. § 23.43(a).

3. *See* Affidavit of Patricia R. O'Brien ("O'Brien Aff.") ¶¶ 2–11; Affidavit of Brian K. Price ("Price Aff."), ¶ 2.

4. *See* 49 C.F.R. § 23.53(a)(2).

5. *See* 425 C.M.R. 2.03(4).

6. *Id.*

7. *See* Letter from SOMWBA to Robinson dated September 30, 1993 at MHD Opp. to Prelim.Inj., Ex. G. ("Letter 1").

8. *See* Letter from SOMWBA to Robinson dated September 30, 1993 at MHD Opp. to Prelim.Inj., Ex. G. ("Letter 2").

9. *See* Am.Comp. at 12, n. 5.

Converse continues to perform work for the Massachusetts Highway Department despite its decertifications. Converse has been allowed to continue to perform seven subcontracts worth over $3,000,000 which it received as a DBE before its decertification.[10] Converse also has at least four subcontracts on Massachusetts Highway Department prime contracts for which it was selected as a non-DBE contractor. These four contracts are worth almost $1,000,000. The Massachusetts Highway Department most recently approved Converse as a subcontractor on July 14, 1995, after the institution of this case.[11] Contrary to Converse's assertion, the court does not find that Converse will go out of business if the preliminary injunction it seeks is not granted.

The procedural history of this case is as follows. On the afternoon of Friday, June 23, 1995, Converse filed a complaint against the MBTA and the United States Secretary of Transportation. Converse alleged that the June 12, 1995 Supreme Court decision in *Adarand Constructors, Inc. v. Pena*,[12] rendered the relevant federal and state set-aside programs unconstitutional. Converse asked for a preliminary injunction restraining the MBTA from opening bids on June 27, 1995 for what is characterized as a $102,000,000 Green Line contract and from awarding that contract pending ultimate resolution of this case. The parties responded expeditiously over that weekend.

After a hearing on June 27, 1995, this court denied the motion for a preliminary injunction. The court also said that the decision not to enjoin the award of the Green Line contract would be reconsidered if the plaintiff provided a substantial basis for doing so.

On July 7, 1995, the plaintiff filed an amended verified complaint. It added four more Massachusetts agencies or authorities as defendants, and continued to include the MBTA and the United States as defendants. In the prayer for relief in the amended verified complaint Converse requests that the court enjoin the opening or award of contracts using federal or state affirmative action set-aside programs.[13] The prayer for relief also requests a declaratory judgment that federal and state programs, including SOMWBA, violate the plaintiff's constitutional right to equal protection.[14] In essence, Converse essentially now seeks to prevent others from benefiting from programs which profited Converse until it was decertified for serving as a "front" for white investors.

On July 12, 1995, Converse voluntarily dismissed the United States Department of Transportation as a defendant in this case.

Shortly thereafter, the Massachusetts Highway Department agreed to defer opening bids for the Massachusetts Avenue project for about two weeks, until August 4, 1995, in order to permit this matter to be presented to this court and permit the court to decide the motion for preliminary injunction on a proper basis. However, even this relatively short delay will injure the progress of that project. The direct costs resulting from delay of the Massachusetts Avenue project are $118,000 per week.[15] Delay in the progress of that project also delays work on other elements of the CA/T project, imposing additional costs on the total CA/T endeavor. Delay also inconveniences motorists and all who must rely on the transportation system in Greater Boston, which is disrupted during the CA/T construction project.

The Massachusetts Highway Department also agreed to defer receiving and opening contracts concerning the Fort Point Channel contract to August 15, 1995. The evidence indicates that each week of delay on that contract costs $70,000,[16] and also has ripple effects on other work that must eventually be done.

---

10. O'Brien Aff. ¶ 7.

11. *Id.* ¶ 17–19.

12. —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

13. Am.Comp. at 12.

14. *Id.*

15. Affidavit of Michael J. Grealy ("Grealy Aff.") ¶ 13.

16. *Id.* ¶ 14.

The two Massachusetts Highway Department contracts now at issue are each substantially federally funded. DBE participation is mandated by § 1003 of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA").[17] DBE participation is also mandated by the regulations which implement ISTEA.[18]

On July 19, 1995, Converse filed a memorandum in support of its motion for preliminary injunction. Consistent with the voluntary dismissal of the United States as a defendant, the plaintiff in that memorandum stated: "Converse is no longer challenging the constitutionality of any federal statute or regulation. Rather, Converse is challenging only the Commonwealth's MBE apparatus (statutes, regulations, rules and orders)."[19] At the August 2, 1995 hearing, Converse repeatedly confirmed the representation that it was not challenging the constitutionality of the federal program.

Converse has also altered the description of the preliminary injunctive relief it is seeking. In the July 19, 1995 memorandum, Converse stated that it was only requesting that the award of the DBE portion of the contracts at issue be enjoined.[20] The defendants' submissions argued that such relief was tantamount to enjoining the award of the contracts completely.

In Converse's reply brief,[21] and at the August 2, 1995 hearing, Converse again changed its position with regard to relief. Most recently, Converse has requested a preliminary injunction ordering that the contracts at issue be awarded without the use of any set-aside program until this case is resolved. This would, among other things, require resolicitation of bids for the Massachusetts Avenue contract, causing about a one-month delay and, therefore, imposing additional direct costs of almost $500,000.

Converse could not afford to post security to compensate any of the defendants for their losses if it is ultimately found that a preliminary injunction should not have been granted.

In addition, a preliminary injunction would have very harmful effects on the intervenors and other beneficiaries of set-aside programs. The intervenors in this case are DBEs, MBEs and WBEs eligible to participate and benefit from the set-aside programs. The evidence indicates that when set-aside programs have been suspended in other states, such as New York and North Carolina, the volume of subcontracts going to MBEs and WBEs has declined dramatically.[22] Thus, the concerns expressed by intervenors such as Theodore Webster and Mary O'Donnell, that their businesses are likely to be destroyed if all of the MBE, WBE and DBE programs from which they benefit are suspended, seem to be well-founded.[23]

III. *Conclusions of Law*

With regard to the conclusions of law, I first considered the question of Converse's standing to maintain this action. I find that Converse does have standing at least to challenge the two Massachusetts Highway Department contracts immediately at issue.

■ To establish standing, a plaintiff must show that continued use of set-asides constitutes " 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' "[24]

■ Converse claims that it intends to seek to participate in all of the public contracts being awarded by the defendants.

---

**17.** Pub.L. No. 102–240; 105 Stat. 1919.

**18.** 49 C.F.R., Part 23.

**19.** Plaintiff's Mem. of Law in Supp. of Am. and Restated Emergency Mot. for Preliminary Injunction at 5.

**20.** *Id.* at 2–3.

**21.** Plaintiff's Reply Mem. at 28.

**22.** O'Brien Aff. ¶ 36; Affidavit of Nathan T. Garrett ("Garrett Aff.") ¶ 3.

**23.** Affidavit of Theodore Webster ¶¶ 2–4; Affidavit of Mary O'Donnell ¶ 4.

**24.** *Adarand,* ── U.S. at ──, 115 S.Ct. at 2104, *quoting, Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

This contention has not been generally refuted. There is, however, no evidence that Converse submitted price quotations to potential prime contractors regarding the MBTA Green Line contract. This raises a question concerning Converse's standing with regard to that contract. It also casts some doubt on the claim that Converse can and will seek to participate in all public contracts. However, the injury for standing purposes is a lack of opportunity to compete with all other bidders on an equal footing.[25] For present purposes, I assume that injury has been established although it is a question that might be litigated further later in this case.

■ With regard to the standards that apply in determining whether a preliminary injunction should be issued, there is a familiar four-part test. The test requires that the plaintiff prove each of the following:

(1) That the plaintiff has a reasonable likelihood of success on the merits;

(2) That the plaintiff does not have an adequate remedy at law such that it will suffer irreparable harm without the injunction;

(3) That the harm to the plaintiff is greater than the harm that the defendant(s) will suffer if the injunction is granted; and

(4) That the injunction will not harm the public interest.[26]

■ Generally, a moving party must make a stronger showing of likelihood of success on the merits as the seriousness of the harm to the opposing party increases.[27] In addition, it is axiomatic that a request for a preliminary injunction is a request for equitable relief.[28] It is not a remedy which issues automatically. Rather, the court must exercise sound discretion. In doing so, the court must pay particular attention to the public consequences of issuing an injunction. As the Supreme Court has said on several occasions:

"The award of an interlocutory injunction has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff ... where an injunction is asked which will adversely affect the public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the Court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." [29]

■ With regard to the two Massachusetts Highway Department contracts now at issue, although the plaintiff has shown he may suffer some degree of irreparable harm in the absence of an injunction, the preliminary injunction is being denied because: (a) the plaintiff has not shown a reasonable likelihood of success on the merits; (b) the balance of hardship favors the defendants, including the intervenors; and (c) the public interest would be injured by the issuance of the injunction.

With regard to the likelihood of success on the merits, the plaintiff has not demonstrated that it is reasonably likely to succeed ultimately in its case against the Massachusetts Highway Department.

Each of the two Massachusetts Highway Department contracts now at issue is substantially federally funded. Federal law requires that the Massachusetts Highway Department implement a DBE participation goal for all contracts which are in part federally funded.[30] In doing so, the Massachusetts Highway Department and SOMWBA utilize the federal standards and procedures

**25.** *Adarand,* —— U.S. at ——, 115 S.Ct. at 2104.

**26.** *Concrete Machinery v. Classic Lawn Ornaments,* 843 F.2d 600, 611 (1st Cir.1988).

**27.** *Moore's Federal Practice* ¶ 65.04[1] at 65–27, *citing, A–Copy v. Michaelson,* 599 F.2d 450 (1st Cir.1978).

**28.** *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944); *Weinberger*

*v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982).

**29.** *Weinberger,* 456 U.S. at 312–13, 102 S.Ct. at 1803, *quoting, Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944).

**30.** 49 C.F.R. § 23.43.

found in the federal regulations, 49 C.F.R., Part 23. The program prescribed by 49 C.F.R., Part 23 is similar to the set-aside program found by the Supreme Court, in 1980, to be constitutional in *Fullilove v. Klutznick.*[31]

The 1995 *Adarand* decision addresses further the standards to be applied to determine the constitutionality of such programs. In *Adarand,* the Supreme Court expressly left open the question whether that decision would have affected the outcome in *Fullilove.* More specifically, in *Adarand* the Supreme Court said:

> To the extent (if any) that *Fullilove* held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling. But, we need not decide today whether the program upheld in *Fullilove* would survive strict scrutiny as our more recent cases have defined it.[32]

In the present case, Converse does not challenge the constitutionality of the federal program. Thus, it has not shown that it is reasonably likely to prove that federal program is unconstitutional under *Adarand.*

Converse argues, however, that since there is also state money involved in the contracts at issue, the court should address the state programs, find them unconstitutional, and issue the requested preliminary injunction. However, the existence of partial state funding does not affect the constitutionality of the conduct of the Massachusetts Highway Department concerning the contracts now at issue.

As the District Court held in *Milwaukee County Pavers Association v. Fiedler:*[33]

> What is important to a determination of constitutionality is not the source of the funds, but the source of the state's authority for spending the funds. Where [as

here] federal law dictates that a project must be partially funded by the state, the expenditure of state funds does not cause the program to lose its character as a federal program.[34]

Writing for the Seventh Circuit, Judge Richard Posner affirmed this analysis, stating: "Insofar as the state is merely complying with federal law, it is acting as the agent of the federal government and is no more subject to being enjoined on equal protection grounds than the federal civil servants who drafted the regulations."[35] The Second, Sixth and Tenth circuits have reached this same conclusion.[36]

■ This court also finds the Seventh Circuit's analysis persuasive. More specifically, the court concludes that if the state agency at issue does what federal law requires, its conduct is constitutional, at least where, as here, the constitutionality of the federal program is not challenged.

The state's actions could be challenged, however, if state agencies depart from the federal standards; that is, the federal program involved in this case could be found unconstitutional as applied by the Massachusetts Highway Department.[37] However, the evidence presented indicates that Converse is not reasonably likely to prove that the Massachusetts Highway Department has deviated from the valid federal regulations.

Converse contends that SOMWBA has departed from the federal program by using state certification standards which are different from the prescribed federal DBE standards. However, the evidence indicates that the Massachusetts Highway Department and SOMWBA understand that they have distinct obligations concerning contracts that receive federal funds, and that they apply the stan-

---

**31.** 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

**32.** *Adarand,* —— U.S. at ——, 115 S.Ct. at 2117.

**33.** 731 F.Supp. 1395 (W.D.Wis.1990).

**34.** *Id.* at 1410.

**35.** *Milwaukee County Pavers Association v. Fiedler,* 922 F.2d 419, 423 (7th Cir.1991).

**36.** *See Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 57 (2d Cir.1992); *Tennessee Asphalt Company v. Farris,* 942 F.2d 969, 975 (6th Cir.1991); *Ellis v. Skinner,* 961 F.2d 912, 915 (10th Cir.1992).

**37.** *See Milwaukee County Pavers,* 922 F.2d at 424–25; *Harrison,* 981 F.2d at 57.

dards and procedures applicable to each contract.

Converse has offered no credible evidence that the Massachusetts Highway Department is not properly applying the federal standards and procedures concerning the two contracts now at issue. In addition, there is no evidence that the United States Department of Transportation, which is responsible for monitoring compliance with the federal standards, has ever criticized the Massachusetts Highway Department's conduct generally, or found deficiencies concerning the contracts now at issue or any others concerning the CA/T projects.

In view of the foregoing, the plaintiff has not shown it is reasonably likely to prove that the federal program is unconstitutional as it is being applied by the Massachusetts Highway Department to the contracts now at issue.

Converse also contends it has a reasonable likelihood of prevailing because the regulations concerning the SOMWBA certification process, 425 C.M.R. § 200 et seq., are unlawful and invalid, and that SOMWBA lacks the statutory authority to promulgate those or any other regulations.[38] However, in its verified amended complaint, plaintiff states: "Converse has raised this same issue on appeal of its case against SOMWBA in the state court."[39]

To the extent that Converse seeks to relitigate this issue in federal court, the defendants are likely to prevail in their assertion that res judicata applies.[40] At a minimum, if the issue is pending in the ongoing proceeding in the Massachusetts Appeals Court, this court is likely to abstain from addressing it pursuant to principles enunciated by the Supreme Court in Younger v. Harris.[41] Moreover, any issue that could have been raised in the state court litigation would have res judicata effect in this case.[42]

Finally, for these purposes, even assuming, without finding, that Converse has some unarticulated Fourteenth Amendment Equal Protection claim concerning SOMWBA which this court can and should decide, Converse has not shown that it is reasonably likely to prevail on that claim.

Converse has, however, demonstrated that it will suffer some degree of irreparable harm if a preliminary injunction is not issued and Converse prevails on the merits. Converse asserts that it intends to attempt to participate in the two Massachusetts Highway Department contracts now at issue. Crediting that assertion, I find that any harm from a violation of its constitutional rights is imminent.

■ In addition, with regard to the Massachusetts Highway Department, in contrast to the other defendants, Converse has no adequate remedy at law. The Massachusetts Highway Department is an agency of the Commonwealth of Massachusetts. The Eleventh Amendment bars a suit in federal court against a state agency for money damages under § 1983.[43] A § 1983 suit brought against the MHD in state court for money damages would be barred because a state is not a "person" for purposes of § 1983.[44] Similarly, the plaintiff would also be barred from suing the MHD in state court, under state law, for damages arising from a violation of its civil rights.[45]

In certain circumstances, Converse could sue the Massachusetts Highway Department for failure to permit it to obtain a public

38. Am.Comp. ¶ 9.

39. Am.Comp. at 12 n. 5.

40. See, e.g., Isaac v. Schwartz, 706 F.2d 15, 16–17 (1st Cir.1983); Heacock v. Heacock, 402 Mass. 21, 23–24, 520 N.E.2d 151 (1988).

41. See Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (district court should abstain from interfering with ongoing state proceedings).

42. See Isaac, 706 F.2d at 16 (res judicata prevents relitigation of issues that could have been raised in an earlier litigation).

43. See, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

44. O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 139, 612 N.E.2d 641 (1993).

45. Commonwealth v. ELM Medical Laboratories, 33 Mass.App.Ct. 71, 78, 596 N.E.2d 376 (1972).

contract. However, absent a showing of bad faith by the state agency, the plaintiff would be limited to recovering bid preparation costs. Thus, Converse could not recover its lost profits if it prevailed.[46]

In addition, the plaintiff has adequately shown that with regard to the Massachusetts Highway Department, it will suffer some degree of irreparable harm if a preliminary injunction is not issued and it is entitled to prevail on the merits. I am really giving Converse the benefit of the doubt on this issue for purposes of this hearing, but it is a proposition that is in some respects in doubt.

First, with regard to the question of irreparable harm, I find that Converse has not shown that it is likely to go out of business if the requested preliminary injunction is not granted. Converse is continuing to get some subcontracts on Massachusetts Highway Department construction projects even though it is not a certified DBE. Since its decertification, Converse has received four contracts as a non-DBE. The most recent contract was approved by the Massachusetts Highway Department on July 14, 1995. Essentially, I find that in the absence of a preliminary injunction Converse's business is likely to be diminished, but it is not likely to be destroyed.

Second, with regard to the deprivation of the constitutional right to equal protection, I will assume for present purposes that such a deprivation involves an element of irreparable harm. That proposition, however, would need to be analyzed in greater depth if it were material to the outcome of the motion for a preliminary injunction.

■ The Court of Appeals of the First Circuit has explained that cases alleging a deprivation of a constitutional right found to involve irreparable harm: "are almost entirely restricted to cases involving alleged infringements of free speech, association, pri-vacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." [47] Nevertheless, district courts in other circuits have held that the constitutional right to equal protection in a case involving minority set-aside provisions is so fundamental that any violation will constitute irreparable harm.[48]

The Supreme Court, however, has expressed a different view. In the *Fullilove* decision affirming the constitutionality of the MBE provisions of the Public Works Employment Act of 1977, Chief Justice Warren Burger said: "[m]iscarriages of administration could only have a transitory economic impact on businesses not encompassed by the program, and would not be irremediable." [49]

Nevertheless, I assume for present purposes that if Converse ultimately prevails, it will have suffered some intangible harm, beyond lost profits, from being deprived of a level playing field in seeking to participate in public contracts. However, because a preliminary injunction is an equitable remedy, it is appropriate and perhaps important to note that Converse did not value this right very highly prior to the inception of this litigation. For many years, Converse was evidently satisfied that competitors were not placed on an equal footing as long as the inequality benefitted Converse. Converse took full advantage of the set-aside programs when it was eligible to do so.

The unequal treatment which Converse now claims violates its constitutional right to equal protection contributed to its profits and its growth. It is transparently obvious that Converse's primary motive in bringing this action is not to establish and vindicate what it perceives to be an important constitutional principle. Rather, having failed so far in its efforts to prove that it was incorrectly determined to be a "front" for white investors, rather than a bona fide DBE or MBE, Con-

---

46. *See, e.g., Bradford & Bigelow, Inc. v. Commonwealth,* 24 Mass.App.Ct. 349, 509 N.E.2d 30 (lost profit damages recoverable only where state agency fails to consider bids in good faith).

47. *Public Service of New Hampshire v. Town of W. Newbury,* 835 F.2d 380, 382 (1st Cir.1987).

48. *See Central Alabama Paving v. James,* 499 F.Supp. 629, 639 (M.D.Ala.1980); *M.C. West v. Lewis,* 522 F.Supp. 338, 341 (M.D.Tenn.1981); *Milwaukee Pavers v. Fiedler,* 707 F.Supp. 1016, 1032 (W.D.Wis.1989).

49. *Fullilove,* 448 U.S. at 489, 100 S.Ct. at 2780.

verse now seeks to prevent those who remain eligible for the set-aside programs from receiving the benefits Converse long enjoyed in the hope that Converse will obtain more subcontracts.

Ultimately, at trial, Converse's motive will be irrelevant to the merits of its constitutional claim. It is, however, relevant in deciding whether Converse should receive the discretionary, equitable relief that it is now seeking. Although on the present record Converse would not in any event be entitled to the preliminary injunction it requests against the Massachusetts Highway Department concerning the two contracts now at issue, Converse's past conduct and present motives reinforce this conclusion.

In addition, the balance of hardships also favors the defendants. As previously described, if the preliminary injunction is not issued, Converse's business is likely to be diminished, but not destroyed.

Originally, Converse requested a preliminary injunction enjoining the opening of bids and the award of contracts concerning the CA/T project, among others, until this case is resolved. Such a remedy would have caused enormous delay, cost, and inconvenience to the public. Those considerations, in part, prompted me, on June 27, 1995, to deny the first preliminary injunction Converse requested.

Next, Converse requested a preliminary injunction barring the award of the DBE portions of the relevant contracts pending a resolution of this case. The defendants, however, demonstrated that the practical effect of such an injunction would be to prevent the performance of the contracts completely. Disadvantaged Business Enterprise subcontracts may involve the earliest phases of a prime contract, such as the demolition stage. Moreover, often work concerning later stages of a contract, including the erection of steel structures, must be done while earlier phases of a project are being completed.

Evidently recognizing that its purportedly narrower request for relief was not, as a practical matter, less burdensome, Converse has most recently requested a preliminary injunction requiring the suspension of the DBE, MBE and WBE programs of the defendants pending the outcome of this case. This injunction would require the rebidding of at least the Massachusetts Highway Department Massachusetts Avenue contract, delaying it alone about a month, at a cost of about $500,000. As described earlier, such a delay would also impede the progress of other contracts which are contingent on the completion of this work.

A suspension of the set-aside programs would also likely cause a diminution in the subcontracts given to Disadvantaged Business Enterprises, including the intervenors. This would, at a minimum, cause significant layoffs. It would also likely cause some of those Disadvantaged Business Enterprises, who are not as well-established or as strong as Converse, to go out of business.

Converse is not capable of posting the bond usually required by Rule 65(c) of the Federal Rules of Civil Procedure to compensate for damages suffered by a party who is ultimately found to have been wrongly enjoined. Therefore, the Massachusetts Highway Department and the intervenors would be irreparably harmed if a preliminary injunction were issued and, as the court predicts on the present record, the plaintiff does not ultimately prevail on the merits.

Finally, for these purposes, the public interest would also be harmed by the issuance of the requested preliminary injunction. The Disadvantaged Business Enterprise provisions of federal law were enacted by Congress and the President. The United States Supreme Court affirmed the constitutionality of similar provisions in *Fullilove,* in 1980. While, as I said earlier, the Supreme Court noted that it is an open question whether the June 19, 1995 *Adarand* decision qualifies this conclusion, Converse does not now claim that the relevant federal program is unconstitutional. Thus, it would be adverse to the public interest to deny the benefit of that program to the Disadvantaged Business Enterprises which would be affected during the pendency of this case against the Massachusetts Highway Department.

There is, however, a larger consideration of the public interest—one that also applies, although in somewhat different ways, to the

claims against the defendants other than the Massachusetts Highway Department. I think that seeing this case in a larger context is important. Frankly, I hope all of the parties will consider the following observations and their implications as they decide whether this case ought to be maintained and, if so, what issues should be litigated.

This case is really about more than Converse's income or the construction of a transportation system. This case is a manifestation of what historically has been our nation's most difficult and enduring dilemma—the question of discrimination against African Americans particularly, but others as well.

Slavery was plainly inconsistent with the assertion in the Declaration of Independence that all men are created equal. However, in order to form this nation's constitutional government a compromise permitting some slavery was required; otherwise the Constitution would not have been enacted. After the enactment of the United States Constitution, elected officials continued to wrestle with this dilemma, and temporarily readjusted its resolution in legislation such as the Missouri Compromise.

In 1857, however, the United States Supreme Court substantially took the issue of slavery out of the political arena with its decision in the *Dred Scott*[50] case, which essentially denied the power of the federal and state governments to bar slavery. That decision contributed significantly to precipitating the Civil War. This fact has prompted Judge Robert Bork, among others, to observe that: "There is something wrong ... with a judicial power that can produce a decision that takes a civil war to overturn".[51]

Political issues concerning discrimination based on race have, of course, endured since the Civil War. These issues have also expanded to include questions of discrimination based on ethnicity and gender, as perhaps most prominently symbolized by the lapsed effort to enact an Equal Rights Amendment concerning women.

In all of these matters, the Congress and the President, and the Governors and the State legislatures, share with the courts the duty to decide what is constitutionally permissible. In fact, it is their duty in the first instance to decide whether something is allowed by the Constitution.[52]

Accordingly, this court expected to find that after the 1989 decision in the *Croson* case,[53] the Commonwealth of Massachusetts had promptly done a disparity study and addressed its findings, in order to decide whether, as *Croson* requires, there was demonstrated discrimination or its lingering effects in Massachusetts, and what remedy, if any, was necessary to eliminate the effects of any such discrimination. Although this issue has not come into sharp focus, it now appears that the Commonwealth may not yet have satisfied its responsibility in responding to the United States Supreme Court decision in *Croson.*

When the political branches have performed their responsibilities, it is the duty of the courts to review their decisions in certain circumstances. It is important to recognize, however, that the political branches have a power which unelected judges should not exercise in a democracy. In the context of this case that is the power to decide whether it is most appropriate to exert what elected officials perceive to be the full extent of the government's constitutional power to combat discrimination or its enduring effects. More specifically, for the political branches the issue of minority set-asides really presents two questions. The first question is whether the Constitution permits a set-aside program in these circumstances. If it does, the second question is whether such a program is wise in view of the legitimate competing interests involved.

Judges, who are not elected, have the power, when necessary, to address the first ques-

---

**50.** *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856).

**51.** Robert Bork, *The Tempting of America,* 34.

**52.** *See West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624, 646–50, 63 S.Ct. 1178, 1189–91, 87 L.Ed. 1628 (Frankfurter, J., dissenting); *Spacco v. Bridgewater School Dept.,* 739 F.Supp. 30, 34 (D.Mass.1990).

**53.** *City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

tion—whether a given minority set-aside program is constitutional. Courts, however, have not been created to address the second question—whether such a program is the wisest resolution of the interests which are in tension.

It is vividly clear that issues concerning affirmative action are now being hotly debated, nationally and locally. Indeed, today's Boston newspapers report that in 1996 there will be a referendum on the question of whether the Commonwealth of Massachusetts should eliminate its set-aside programs.[54]

The current debate confirms the accuracy of Chief Justice Burger's observation in *Fullilove* that: "The federal MBE provision may be viewed as a pilot project, appropriately limited in extent and duration, and subject to reassessment and re-evaluation by the Congress prior to any extension or re-enactment."[55] The current political debate also confirms the wisdom of Chief Justice Burger's reminder of Justice Robert Jackson's description of the value in a democracy of judicial restraint in circumstances where controversial issues have been temporarily resolved, but are still being debated and may later be readjusted through the political process.[56]

Right now, in the aftermath of *Adarand*, the Executive Branch of the United States government is reviewing whether the present federal set-aside programs are constitutional. Congress should also be doing that. In any event, it is clear that Congress is now debating the issue whether such set-aside programs are in the public interest. There is value in a democracy in permitting the people, directly and through their representatives, to wrestle with these hard issues, which are manifestations of enduring, historical dilemmas. As Justice Louis Brandeis often observed, we must labor in each generation to truly possess the liberties that we have inherited.[57] In the current context, this suggests that, as one commentator has recently written, perhaps this country is finally ready to embrace the ideal that we will operate legally as a color blind society. However, if unelected judges unnecessarily short-circuit the political debate, we may never know for sure.[58]

Generally, courts should not decide constitutional questions unnecessarily.[59] This principle is particularly compelling when the question is presented on a motion for preliminary injunction and the programs in question are being reviewed, and may be revised or revoked, before the case is complete. Ultimately, if necessary, the courts may have to decide if the political branches have acted

**54.** Peter J. Howe & Shelley Murphy, *Rollback's Effects Seem Limited: Many Affirmative Action Programs Would Stay*, Boston Globe, August 14, 1995, at 21.

**55.** *Fullilove*, 448 U.S. at 489, 100 S.Ct. at 2780.

**56.** In *Fullilove*, the Chief Justice wrote that "[a]s Mr. Justice Jackson admonished in a different context in 1941:

The Supreme Court can maintain itself and succeed in its tasks only if the counsels of self-restraint urged most earnestly by members of the Court itself are humbly and faithfully heeded. After the forces of conservatism and liberalism, of radicalism and reaction, of emotion and of self-interest are all caught up in the legislative process and averaged and come to rest in some compromise measure such as the Missouri Compromise, the N.R.A., the A.A.A., a minimum-wage law, or some other legislative policy, a decision striking it down closes an area of compromise in which conflicts have actually, if only temporarily, been composed. Each such decision takes away from our democratic federalism another of its defenses

against domestic disorder and violence. The vice of judicial supremacy, as exerted for ninety years in the field of policy, has been its progressive closing of the avenue to peaceful and democratic conciliation of our social and economic conflicts."

*Id.* at 490, n. 75, 100 S.Ct. at 2781, n. 75 quoting R. Jackson, The Struggle for Judicial Supremacy 321 (1941).

**57.** "Any inheritance really belongs to the legatees only as they strive to make it part of their own deepest nature. This is simply to paraphrase one of Brandeis' own favorite passages from Goethe: 'you must labor to possess that which you have inherited.'" Paul A. Freund, *On Law and Justice* 119.

**58.** "The Color-Blind Court," *New Republic*, July 31, 1995 at 19.

**59.** *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J. concurring); *Spacco* at 36.

consistently with their obligations under the Constitution. It is desirable, however, that in the first instance the federal and state governments address the constitutional questions concerning their set-aside programs raised by the Supreme Court, particularly in the *Adarand* and *Croson* cases, and the political questions as well.

Indeed, as I said earlier, they have a duty to reconsider the constitutionality of the set-aside programs. Once again, it is not clear to this court what the Executive and Legislative branches of the Commonwealth of Massachusetts have done since *Croson* to decide the constitutionality of the state set-aside programs.[60] I have not been required to address this question in deciding the present motion for a preliminary injunction. However, if it turns out that six years after *Croson,* while a disparity study has been completed, the politically accountable officials of the Commonwealth have not decided whether there is a proper basis for set-aside programs, and whether the present statutes and executive orders are narrowly tailored only to remedy proven discrimination, that failure will be disappointing and disturbing to the court. More significantly, any failure of the political branches to act responsibly after a Supreme Court decision invites judicial intervention. I have just explained why, given our separation of powers, a certain degree of judicial restraint, and the government will probably argue a certain degree of deference, is due to the political branches. That deference is not going to be given, however, if the political branches fail to respond to authoritative court decisions.

Courts, including this court, will, where necessary and appropriate, hold state and local officials to the constitutional limits of their delegated legal power. I did that myself most recently in the St. Patrick's Day Parade case.[61]

However, as I said, to be colloquial, the parties, particularly Converse, should not lose sight of the forest for the trees. There are interests of historic importance to our country implicated in this case. There are also considerations rooted in the architecture of our government, characterized by separation of powers and federalism, that are involved. While this litigation has thus far proceeded on an accelerated basis, when I see all of you this afternoon, I am going to urge you to pause and consider what we are about and what you each really want to do in the circumstances.

### IV. *Order*

In view of the foregoing, plaintiff's motion for a preliminary injunction concerning Massachusetts Highway Department Contracts C12A3 and CO9B3 is hereby DENIED.

---

60. In this context, the "Commonwealth" refers particularly to the Massachusetts Highway Department. It appears that the Massachusetts Water Resource Authority and the Massachusetts Turnpike have already taken some action to review and revise their set-aside programs after *Croson.*

61. *South Boston Allied War Veterans v. City of Boston,* 875 F.Supp. 891 (D.Mass.1995).